IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP,

      Plaintiff,

  v.

KIMBERLY-CLARK CORPORATION,
KIMBERLY-CLARK GLOBAL SALES,
INC., and
KIMBERLY-CLARK WORLDWIDE, INC.,

      Defendants.

Civil Action No.:  1:09-cv-02263

Judge Virginia M. Kendall

## KIMBERLY-CLARK'S RESPONSE TO GEORGIA-PACIFIC'S MOTION FOR CONTINUANCE PURSUANT TO RULE 56(F)

Defendants Kimberly-Clark Corporation, Kimberly-Clark Worldwide, Inc. and Kimberly-Clark Global Sales, Inc. (hereinafter "Kimberly-Clark") file this response to "Plaintiff's Motion for Continuance Pursuant to Fed.R.Civ.P. 56(f)" ("Motion for Continuance") filed by Georgia-Pacific Consumer Products LP ("Georgia-Pacific").  For the reasons discussed below, Georgia-Pacific fails to establish that the requested discovery is necessary to present facts essential to its opposition to Kimberly-Clark's motion for summary judgment.  Georgia-Pacific's motion should therefore be denied.

## I.      INTRODUCTION

After the parties engaged in extensive discovery and completed all the briefing on Georgia-Pacific's motion for preliminary injunction, Georgia-Pacific withdrew its motion. Kimberly-Clark then requested leave to file a motion for summary judgment based on the functionality of Georgia-Pacific's asserted designs.  On September 17, 2009, after obtaining

acknowledgement from both sides that the issue of functionality is indeed potentially dispositive of all claims in this case, the Court set a briefing schedule on Kimberly-Clark's motion for summary judgment and stayed discovery pending disposition of the summary judgment motion.

Kimberly-Clark's motion for summary judgment based on functionality argues the same points that were fully briefed in opposition to Georgia-Pacific's now-withdrawn motion for preliminary injunction.   As discussed in the motion for summary judgment, Georgia-Pacific owns several utility patents that cover the same designs for bath tissue that Georgia-Pacific is asserting as trademarks against Kimberly-Clark.  All of these embossed designs for bath tissue are illustrated, discussed and claimed in one or more of the following Georgia-Pacific United States utility patents:  Patent Nos. 5,436,057, 5,573,830, 5,597,639, 5,620,776, and 5,874,156 (collectively " utility patents").

These utility patents have "vital significance" in determining whether Georgia-Pacific's designs can be protected under the trademark laws, because a utility patent is "strong evidence" that the features covered by the patent are functional.  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).  Accordingly, Kimberly-Clark has moved for summary judgment on the basis that Georgia-Pacific's asserted designs are invalid as trademarks on the grounds of functionality.  If granted, the motion for summary judgment will dispose of all the issues in this case and avoid the need for further discovery, motion practice and trial.

Despite the Court's previous rejection of Georgia-Pacific's request for discovery in its September 17th Order, Georgia-Pacific again requests that it be permitted to take additional discovery.  There is no additional discovery needed that would bear on the pending motion

for summary judgment that Georgia-Pacific's asserted designs are functional. In fact, the proposed discovery that Georgia-Pacific seeks relates to a product – Kimberly-Clark's "Scott Extra Soft" – that is not even the subject of the current suit. Rather, the "Scott Extra Soft" product is the subject of a new lawsuit that Georgia-Pacific recently filed against Kimberly-Clark.

The discovery requested by Georgia-Pacific has no relevance to the only issue to be decided on Kimberly-Clark's motion for summary judgment – the functionality of Georgia-Pacific's asserted designs. Because the requested discovery is not germane to the motion, and because Georgia-Pacific has already taken extensive discovery in this case, its Motion for Continuance is without merit and should be denied.

## II.    DISCUSSION

### A.    The Court Should Adhere to its September 17th Order

The parties acknowledge that functionality is a threshold issue in this case. If Georgia-Pacific's designs are found to be functional, they are not eligible for trademark protection, and Georgia-Pacific will be unable to prevail on its claims.[1]

On September 17, 2009, the parties appeared before the Court and discussed summary judgment briefing. Counsel for Kimberly-Clark advised the Court that Kimberly-Clark would be filing a potentially dispositive motion on the issue of functionality of the asserted designs, the same issue briefed in detail in Kimberly-Clark's opposition to the now-

---

[1] Moreover, Georgia-Pacific is asserting the same designs both in this case and in the recently-filed case against the "Scott Extra Soft" product. Thus, Kimberly-Clark's motion for summary judgment based on functionality is potentially dispositive of all of the issues *both* in this case and in the newly-filed case.

withdrawn motion for preliminary injunction.  Counsel for the parties acknowledged that

entry of summary judgment on functionality grounds would end the case.  Specifically,

counsel for Georgia-Pacific agreed that if the embossed designs are determined to be

functional, the entire case ends:

> THE COURT:  Right.  And if we do the functionality summary judgment, though, what will be left if you are correct?
>
> MR. HANDELMAN (counsel for Kimberly-Clark):  There would be nothing left.  That is a threshold issue.  If the Court grants summary judgement[sic] on functionality, that disposes of the entire case.  The Court would not have to reach the issue of likelihood of confusion nor get into extensive damages discovery and so on.  And that's precisely why we're proposing we file our motion within 30 days.  Other fact and expert discovery would be suspended pending the Court's ruling on the motion.  And, your Honor, to streamline things, we will not be relying on expert testimony in support of the summary judgment motion.  There's not even a need for expert discovery on that motion, on functionality.
>
> THE COURT:  All right.  Do you agree that the case would be resolved if he's correct on his functionality theory?
>
> MR. HENN (counsel for Georgia-Pacific): If he wins functionality, we don't have a trademark anymore, so the case goes away.

A copy of the transcript of the September 17, 2009 hearing is attached hereto as Exhibit A.

Georgia-Pacific has provided no reason for modifying the Court's previous ruling

staying discovery.  The Court should adhere to its earlier decision to stay discovery pending

disposition of the motion for summary judgment.  Georgia-Pacific has not shown that the

requested discovery is necessary for it to respond to the motion for summary judgment.

Indeed, Georgia-Pacific has already filed a lengthy substantive response to the summary

judgment motion, consisting of a brief, an expert report, additional affidavits and numerous

exhibits.

**B.    There Is No Justification for Georgia-Pacific's Requested Discovery**

Georgia-Pacific's Motion for Continuance under Rule 56(f) is without merit.  It is well settled that a request for discovery pursuant to Rule 56(f) must be adequately supported by a showing of need, and that a request for discovery should be denied where, as here, the requested discovery is not relevant to the issues raised in the summary judgment motion. *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002) (noting that Rule 56(f) motion was flawed because the evidence sought was not relevant to the issues to be decided); *Alexander v. Shan*, 161 Fed. Appx. 571, 577, 2005 WL 3557442 *4 (7th Cir. 2005) (holding that Rule 56(f) motion was properly denied where the information sought was not relevant); *Korf v. Ball State University*, 726 F.2d 1222, 1230-31 (7th Cir. 1984) (holding that Rule 56(f) motion was properly denied where the requested discovery was not relevant to the claim at issue).

In the present situation, Georgia-Pacific is requesting discovery directed solely to Kimberly-Clark's "Scott Extra Soft" product.  For convenience, a summary of the discovery requested by Georgia-Pacific is attached hereto as Exhibit B.

The information sought in Georgia-Pacific's proposed discovery is not germane to the issue raised in Kimberly-Clark's motion for summary judgment, namely, the functionality of Georgia-Pacific's asserted designs which are claimed in Georgia-Pacific's utility patents.  Matters such as why Kimberly-Clark adopted the "Scott Extra Soft" design, and research concerning how consumers perceive the "Scott Extra Soft" design, have no relevance to the functionality of Georgia-Pacific's asserted designs as covered by its utility patents.  Georgia-Pacific's requested discovery represents nothing more than a fishing expedition and runs counter to the

5

limited purpose of Rule 56(f).  *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 885-86

(7th Cir. 2005) (holding that a Rule 56(f) request for discovery was properly denied

where it was based on speculation and would amount to a fishing expedition);

*Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (affirming denial of a Rule

56(f) request for discovery where the request "amounts to nothing more than a fishing

expedition"); *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir.

1984) ("Summary judgment need not be denied merely to satisfy a litigant's

speculative hope of finding some evidence [through discovery] that might tend to

support a complaint.").

## III.    CONCLUSION

For the reasons discussed above, Kimberly-Clark requests that Georgia-Pacific's

Motion for Continuance be denied, and that discovery remain stayed pending disposition of

the motion for summary judgment.  Both parties have already taken extensive discovery in

this case.  As this Court previously recognized, there is no justification for further discovery

pending disposition of Kimberly-Clark's motion for summary judgment.


Respectfully submitted,


Date:  November 18, 2009        By:    /s/ Howard S. Michael
                                       Jeffery A. Handelman
                                       Howard S. Michael
                                       BRINKS HOFER GILSON & LIONE
                                       NBC Tower - Suite 3600
                                       455 N. Cityfront Plaza Drive
                                       Chicago, Illinois 60611-5599
                                       Tel:  (312) 321-4200

Fax:  (312) 321-4299

ATTORNEYS FOR DEFENDANTS
KIMBERLY- CLARK CORPORATION,
KIMBERLY- CLARK WORLD-WIDE, INC.
AND KIMBERLY-CLARK GLOBAL
SALES, INC.

<u>Certificate of Service</u>

I certify that a true copy of the foregoing document was served electronically through the ECF system to all counsel of record registered to receive electronic filings, and that I have caused paper copies to be delivered to all counsel of record not so registered, if any.


Date:  November 18, 2009                    /s/ Howard S. Michael

# EXHIBIT A

1

2

3

4              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
5                  EASTERN DIVISION

6

7

GEORGIA-PACIFIC CONSUMER          Case No. 1:09-cv-02263
8  PRODUCTS LP,

9    Plaintiff,                    Chicago, Illinois
                                   September 17, 2009
10        v.                        Status Conference

11  KIMBERLY-CLARK CORPORATION, et al.,

12    Defendants.
    -------------------------------
13

14              TRANSCRIPT OF STATUS CONFERENCE
         BEFORE THE HONORABLE VIRGINIA M. KENDALL
15              UNITED STATES DISTRICT JUDGE

16

17  APPEARANCES:

18

19  For the Plaintiff:    Kilpatrick Stockton LLP
                          By:  R. Charles Henn, Jr.
20                         1100 Peachtree St., Ste. 2800
                          Atlanta, GA 30309
21                         (404) 815-6500

22                              - and -

23                         McGuire Woods, LLP
                          By:  John A. Leja
24                         77 W. Wacker Dr., Ste. 4400
                          Chicago, IL 60601
25                         (312) 849-8100

1

2

3    <u>APPEARANCES (Cont'd)</u>:

4

5

6    For the Defendant:        Brinks, Hofer, Gilson & Lione
     Kimberly-Clark            By:  Jeffrey A. Handelman
7                              455 N. Cityfront Plaza Dr., Ste. 3600
                               Chicago, IL 60611
8                              (312) 321-4200

9

10

11   <u>COURT REPORTER</u>:           FEDERAL OFFICIAL COURT REPORTER
                               April M. Metzler, RPR, CRR
12                             219 South Dearborn St., Rm. 2318-A
                               Chicago, IL 60604
13                             (312) 408-5154
                               April_Metzler@ilnd.uscourts.gov

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.

09:14:54  1        (Commenced at 9:14 a.m.)

09:14:54  2        THE CLERK:  09C2263, Georgia-Pacific Consumer

09:14:59  3    Products versus Kimberly-Clark Corporation.

09:15:11  4        MR. HANDELMAN:  Good morning, your Honor.  Jeff

09:15:13  5    Handelman representing defendants, Kimberly-Clark.

09:15:15  6        THE COURT:  Good morning.

09:15:16  7        MR. HENN:  I'm Charlie Henn here on behalf of the

09:15:19  8    plaintiffs.

09:15:20  9        THE COURT:  Okay.  Good morning.

09:15:20 10        MR. LEJA:  John Leja, McGuire Woods, on behalf of the

09:15:24 11    plaintiff.

09:15:24 12        THE COURT:  Good morning.

09:15:24 13        All right.  Where do we stand?  We have a number of

09:15:27 14    different things up.  And I know that the preliminary

09:15:31 15    injunction then is agreed that we're going to withdraw it at

09:15:33 16    this time.  Both sides agree with that?

09:15:34 17        MR. HENN:  That's correct.

09:15:35 18        THE COURT:  Okay.  And that is because defendants

09:15:39 19    believe -- or the plaintiffs believe that defendants

09:15:42 20    successfully delayed the resolution of the motion, right?

09:15:46 21        MR. HENN:  That's correct, your Honor.

09:15:47 22        THE COURT:  All right.  And is this proposed schedule

09:15:49 23    then for the completion agreed to by the plaintiffs or not?

09:15:53 24        MR. HENN:  Do you have both proposed schedules?

09:15:56 25        THE COURT:  I don't think so.  Let's see.  I have one

4

09:15:59    1   defendants.  I have a response.  And then I have the notice of

09:16:03    2   withdrawal.  Is it within --

09:16:05    3         MR. HENN:  I'm passing it forward now.

09:16:07    4         THE COURT:  No, I don't have the plaintiff's.

09:16:08    5         MR. HENN:  I apologize for filing that late.  We were

09:16:11    6   flying up from Atlanta, and by the time we landed, the court

09:16:14    7   was already closed --

09:16:14    8         THE COURT:  Okay.

09:16:15    9         MR. HENN:  -- to file electronically last night.

09:16:17   10         THE COURT:  So you can't even agree on your schedule;

09:16:20   11   is that right?

09:16:20   12         MR. HENN:  Well, we've had some discussions this

09:16:22   13   morning in the hallway.  And what it really comes down to is

09:16:25   14   whether the case should be essentially put on hold for a few

09:16:31   15   months while the defendants bring their response to the

09:16:35   16   preliminary injunction motion as a summary judgment motion on

09:16:38   17   the issue of functionality further delaying the case by

09:16:42   18   several months.

09:16:42   19         Our schedule would have discovery go ahead.  We both

09:16:47   20   agreed essentially -- the schedule that we proposed, I

09:16:52   21   understand, is fine, in terms of the time between each event,

09:16:56   22   fact discovery, expert disclosures, et cetera, with the

09:16:59   23   plaintiff -- with the defendants.  But the issue is one of

09:17:02   24   whether they would like to stay everything while they move for

09:17:06   25   summary judgment and then only begin to conclude fact

09:17:10    1    discovery after those summary judgment motions are decided.

09:17:12    2        Our view is we've been dealing with delay since this

09:17:15    3    case began --

09:17:16    4        THE COURT:  I really -- you've got it in your papers.

09:17:19    5    You've got it now three times here in court.  The case was

09:17:22    6    filed in late April and there was a lot of briefing and

09:17:27    7    discovery.  I don't see any problem -- and I am someone who,

09:17:32    8    by the way, moves cases along, so I don't see this being a

09:17:35    9    tremendous delay.  So I think you need to get over that issue

09:17:38    10   and let's resolve what we're doing substantively.

09:17:41    11       What's your position on whether you want to file your

09:17:43    12   motion or not?

09:17:44    13       MR. HANDELMAN:  We have submitted a proposed

09:17:46    14   schedule, which reflects the fact that there is a potentially

09:17:49    15   dispositive issue that has already been fully briefed, that is

09:17:52    16   the issue of functionality, and no further discovery is needed

09:17:56    17   on that issue.

09:17:57    18       And as discussed in the earlier submissions, without

09:18:00    19   getting into a lot of detail, Kimberly-Clark has learned that

09:18:05    20   Georgia-Pacific owns several utility patents that cover the

09:18:08    21   very designs being asserted as trademarks against

09:18:12    22   Kimberly-Clark.  These utility patents are significant

09:18:15    23   because, as the Supreme Court teaches, they represent strong

09:18:18    24   evidence that the designs are functional under the TrafFix

09:18:22    25   case.

09:18:22  1        There are also a number of cases in this district and

09:18:25  2  in other districts that recognize that functionality is an

09:18:29  3  issue, based on utility patents, is particularly well-suited

09:18:34  4  for summary judgment because the patent claims and

09:18:36  5  specifications establish functionality as a matter of law

09:18:39  6  without getting into extraneous fact discovery.

09:18:41  7        THE COURT:  Right.  And if we do the functionality

09:18:44  8  summary judgment, though, what will be left if you are

09:18:47  9  correct?

09:18:48  10        MR. HANDELMAN:  There would be nothing left.  That is

09:18:51  11  a threshold issue.  If the Court grants summary judgement on

09:18:53  12  functionality, that disposes of the entire case.  The Court

09:18:56  13  would not have to reach the issue of likelihood of confusion

09:18:59  14  nor get into extensive damages discovery and so on.

09:19:02  15        And that's precisely why we're proposing we file our

09:19:05  16  motion within 30 days.  Other fact and expert discovery would

09:19:09  17  be suspended pending the Court's ruling on the motion.

09:19:12  18        And, your Honor, to streamline things, we will not be

09:19:15  19  relying on expert testimony in support of the summary judgment

09:19:19  20  motion.  There's not even a need for expert discovery on that

09:19:22  21  motion, on functionality.

09:19:23  22        THE COURT:  All right.  Do you agree that the case

09:19:25  23  would be resolved if he's correct on his functionality theory?

09:19:28  24        MR. HENN:  If he wins functionality, we don't have a

09:19:31  25  trademark anymore, so the case goes away.

09:19:33    1          THE COURT:  Okay.  So, I mean, there's nothing left

09:19:35    2    then.

09:19:35    3          All right.  So, what, is there a disagreement that

09:19:38    4    you should not resolve this right away?

09:19:40    5          MR. HENN:  Yes, your Honor.  First of all, both

09:19:42    6    parties filed numerous affidavits on this.  There are --

09:19:45    7          THE COURT:  Right.

09:19:45    8          MR. HENN:  -- numerous fact issues that they're not

09:19:49    9    going to win on summary judgment, in our view.

09:19:52   10          There are tons of fact issues on both sides.  Both

09:19:55   11    parties have fact witnesses.  Both parties have expert

09:19:57   12    witnesses submitted on this issue as to whether the patents

09:20:00   13    cover it and whether, in fact, even if the patents mention a

09:20:03   14    diamond, is the pattern on the toilet paper itself in any way

09:20:08   15    functional to making the toilet paper work, which we think

09:20:13   16    precludes summary judgment, which gets us back to the point of

09:20:16   17    why put everything else on hold.  They're free to -- we have

09:20:18   18    no problem with them filing the motion, taking the briefs,

09:20:20   19    recrafting it as a summary judgment motion and filing it.  We

09:20:23   20    just don't want to put everything else on hold and push the

09:20:26   21    case schedule back even further.

09:20:28   22          So we have no problem proceeding with the briefing

09:20:31   23    schedule they suggest, in terms of the time between filing

09:20:34   24    opposition, filing a reply.  Our only issue is whether we're

09:20:38   25    precluded from getting the rest of the case ready to go to

09:20:42  1    trial in the meantime, because we think the chances of success

09:20:45  2    on the summary judgment are so low.

09:20:46  3              THE COURT:  But that's my call, right?

09:20:48  4              MR. HENN:  Of course.

09:20:48  5              THE COURT:  Well, the problem, though, is if he is

09:20:51  6    right and it is resolved, then you'd be spending all of those

09:20:56  7    dollars of your clients litigating a case that isn't going to

09:21:00  8    go forward.

09:21:01  9              MR. HENN:  True.  Obviously if they -- as we've said,

09:21:04  10   if they win, then the case would go away.  It's a practical

09:21:08  11   consideration, from our perspective.  We'd like to get the

09:21:11  12   case resolved sooner than later.

09:21:13  13             THE COURT:  I'd say attorneys' fees is a pretty

09:21:16  14   practical consideration from everyone's consideration.

09:21:18  15             MR. HENN:  On that point, your Honor, the main reason

09:21:21  16   we took the preliminary injunction motion off the calendar

09:21:23  17   originally was we believe there was a settlement of the case.

09:21:26  18   We thought the attorneys' fees were done.  Then at the last

09:21:29  19   minute it got over-lawyered and it fell apart.

09:21:32  20             And, frankly, if the goal was to save money, we think

09:21:36  21   having a settlement conference where business people are

09:21:38  22   involved, instead of just lawyers arguing, we actually think

09:21:41  23   this thing could settle.  It was very close to settling

09:21:47  24   before.

09:21:47  25             THE COURT:  I'd be happy to sit down with you, if you

09:21:48    1    want.  Who's your magistrate judge?

09:21:51    2            MR. HENN:  I don't know.

09:21:52    3            THE COURT:  I think I can find -- oh, Judge Keys.  Is

09:21:57    4    that right?

09:21:57    5            THE CLERK:  Yes.

09:21:57    6            THE COURT:  All right.  Well, I'd be happy to sit

09:22:00    7    down with you, if you would like to try it.

09:22:03    8            MR. HANDELMAN:  Your Honor, our view on settlement is

09:22:06    9    we did make significant concessions.  We did make progress.

09:22:10    10            We would like to proceed on the summary judgment

09:22:11    11    motion.  We wouldn't rule out a settlement conference with the

09:22:14    12    magistrate, but we'd like to proceed with summary judgment at

09:22:20    13    the same time.

09:22:20    14            THE COURT:  Well, that's usually not done at the same

09:22:22    15    time, because then someone's spending all of that trouble and

09:22:26    16    time and money to do that.  So when you're fighting something

09:22:29    17    legally, you're rarely going to come to the settlement

09:22:33    18    conference with an open mind to resolve it, because you've got

09:22:36    19    one foot fighting and one foot supposedly being cooperative.

09:22:40    20    It doesn't work that way.

09:22:42    21            All right.  I believe that since there is a potential

09:22:46    22    that the case would be resolved upon the first issue, we

09:22:50    23    will -- I am going to adopt the defendants' proposed schedule,

09:22:53    24    which is that your dispositive motions are due by

09:22:57    25    October 16th, and your responsive brief, therefore, will be

09:23:01    1    due on November 13th, and the reply brief will be due on

09:23:06    2    December 1st.  So I gave you a little more time because of the

09:23:08    3    Thanksgiving holiday there.

09:23:11    4            And discovery will be stayed until I rule on the

09:23:15    5    motion and the motions are generally ruled on within two to

09:23:19    6    three months.  So I will see all of you again for a status

09:23:27    7    in -- I'll put down February 26th.  And we'll see if you've

09:23:33    8    got a ruling by then.

09:23:35    9            And that will make me deal with your issue, and if

09:23:38    10   not we'll expect an expedited discovery schedule after that,

09:23:42    11   if it's true that there is a fact dispute.

09:23:46    12           The 26th is a Friday?

09:23:48    13           Okay.  Let's bump it to the Monday after that then.

09:23:51    14           THE CLERK:  March 1st.

09:23:51    15           THE COURT:  March 1st will be your status.  I'll take

09:23:54    16   care of it.  Thank you.

09:23:54    17           MR. HANDELMAN:  Thank you, your Honor.

09:23:55    18           MR. HENN:  Thank you.

09:23:57    19           MR. LEJA:  Thank you, your Honor.

09:23:58    20           (Concluded at 9:23 a.m.)

            21                   - - -

            22

            23

            24

            25

1

2                  C E R T I F I C A T E

3

4      I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7    /s/April M. Metzler, RPR, CRR, FCRR   September 17, 2009

8    April M. Metzler, RPR, CRR, FCRR      Date

9    Official Federal Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s/April** [1] - 11:7

## 0

**09C2263** [1] - 3:2

## 1

**1100** [1] - 1:20
**13th** [1] - 10:1
**16th** [1] - 9:25
**17** [2] - 1:9, 11:7
**1:09-cv-02263** [1] - 1:7
**1st** [3] - 10:2, 10:14, 10:15

## 2

**2009** [2] - 1:9, 11:7
**219** [1] - 2:11
**2318-A** [1] - 2:11
**26th** [2] - 10:7, 10:12
**2800** [1] - 1:20

## 3

**30** [1] - 6:16
**30309** [1] - 1:20
**312** [3] - 1:25, 2:7, 2:12
**321-4200** [1] - 2:7
**3600** [1] - 2:6

## 4

**404** [1] - 1:21
**408-5154** [1] - 2:12
**4400** [1] - 1:24
**455** [1] - 2:6

## 6

**60601** [1] - 1:24
**60604** [1] - 2:12
**60611** [1] - 2:7

## 7

**77** [1] - 1:24

## 8

**815-6500** [1] - 1:21
**849-8100** [1] - 1:25

## 9

**9:14** [1] - 3:1
**9:23** [1] - 10:20

## A

**a.m** [2] - 3:1, 10:20
**above-entitled** [1] - 11:5
**adopt** [1] - 9:23
**affidavits** [1] - 7:6
**agree** [3] - 3:16, 4:10, 6:22
**agreed** [3] - 3:15, 3:23, 4:20
**ahead** [1] - 4:19
**al** [1] - 1:11
**apart** [1] - 8:19
**apologize** [1] - 4:5
**APPEARANCES** [2] - 1:17, 2:3
**April** [3] - 2:11, 5:6, 11:8
**April_Metzler@ilnd.uscourts.gov** [1] - 2:13
**arguing** [1] - 8:22
**asserted** [1] - 5:21
**Atlanta** [2] - 1:20, 4:6
**attorneys'** [2] - 8:13, 8:18

## B

**based** [1] - 6:3
**BEFORE** [1] - 1:14
**began** [1] - 5:3
**begin** [1] - 4:25
**behalf** [2] - 3:7, 3:10
**between** [2] - 4:21, 7:23
**brief** [2] - 9:25, 10:1
**briefed** [1] - 5:15
**briefing** [2] - 5:6, 7:22
**briefs** [1] - 7:18
**bring** [1] - 4:15
**Brinks** [1] - 2:5
**bump** [1] - 10:13
**business** [1] - 8:21

## C

**calendar** [1] - 8:16
**care** [1] - 10:16
**case** [15] - 4:14, 4:17, 5:3, 5:5, 5:25, 6:12, 6:22, 6:25, 7:21, 7:25, 8:7, 8:10, 8:12, 8:17, 9:22
**Case** [1] - 1:7
**cases** [2] - 5:8, 6:1
**certify** [1] - 11:4
**cetera** [1] - 4:22
**chances** [1] - 8:1
**Charles** [1] - 1:19
**Charlie** [1] - 3:7

**Chicago** [4] - 1:9, 1:24, 2:7, 2:12
**Cityfront** [1] - 2:6
**claims** [1] - 6:4
**CLARK** [1] - 1:11
**Clark** [5] - 2:6, 3:3, 3:5, 5:19, 5:22
**CLERK** [3] - 3:2, 9:5, 10:14
**clients** [1] - 8:7
**close** [1] - 8:23
**closed** [1] - 4:7
**Commenced** [1] - 3:1
**completion** [1] - 3:23
**concessions** [1] - 9:9
**conclude** [1] - 4:25
**Concluded** [1] - 10:20
**Conference** [1] - 1:10
**conference** [3] - 8:21, 9:11, 9:18
**CONFERENCE** [1] - 1:14
**confusion** [1] - 6:13
**consideration** [3] - 8:11, 8:14
**CONSUMER** [1] - 1:7
**Consumer** [1] - 3:2
**Cont'd** [1] - 2:3
**cooperative** [1] - 9:19
**CORPORATION** [1] - 1:11
**Corporation** [1] - 3:3
**correct** [5] - 3:17, 3:21, 6:9, 6:23, 11:4
**course** [1] - 8:4
**Court** [4] - 5:23, 6:11, 6:12, 11:9
**court** [2] - 4:6, 5:5
**COURT** [25] - 1:4, 2:10, 3:6, 3:9, 3:12, 3:18, 3:22, 3:25, 4:4, 4:8, 4:10, 5:4, 6:7, 6:22, 7:1, 7:7, 8:3, 8:5, 8:13, 8:25, 9:3, 9:6, 9:14, 10:15
**Court's** [1] - 6:17
**cover** [2] - 5:20, 7:13
**CRR** [3] - 2:11, 11:7, 11:8

## D

**damages** [1] - 6:14
**Date** [1] - 11:8
**days** [1] - 6:16
**deal** [1] - 10:9
**dealing** [1] - 5:2
**Dearborn** [1] - 2:11
**December** [1] - 10:2
**decided** [1] - 5:1
**Defendant** [1] - 2:5
**Defendants** [1] - 1:12
**defendants** [6] - 3:5, 3:18, 3:19, 4:1, 4:15, 4:23
**defendants'** [1] - 9:23
**delay** [2] - 5:2, 5:9
**delayed** [1] - 3:20
**delaying** [1] - 4:17
**designs** [2] - 5:21, 5:24
**detail** [1] - 5:19
**diamond** [1] - 7:14

**different** [1] - 3:14
**disagreement** [1] - 7:3
**disclosures** [1] - 4:22
**discovery** [11] - 4:19, 4:22, 5:1, 5:7, 5:16, 6:6, 6:14, 6:16, 6:20, 10:4, 10:10
**discussed** [1] - 5:18
**discussions** [1] - 4:12
**disposes** [1] - 6:12
**dispositive** [2] - 5:15, 9:24
**dispute** [1] - 10:11
**district** [1] - 6:1
**DISTRICT** [3] - 1:4, 1:4, 1:15
**districts** [1] - 6:2
**DIVISION** [1] - 1:5
**dollars** [1] - 8:7
**done** [4] - 8:18, 9:14
**down** [4] - 4:13, 8:25, 9:7, 10:7
**Dr** [2] - 1:24, 2:6
**due** [3] - 9:24, 10:1

## E

**EASTERN** [1] - 1:5
**electronically** [1] - 4:9
**entire** [1] - 6:12
**entitled** [1] - 11:5
**essentially** [2] - 4:14, 4:20
**establish** [1] - 6:5
**et** [2] - 1:11, 4:22
**event** [1] - 4:21
**evidence** [1] - 5:24
**expect** [1] - 10:10
**expedited** [1] - 10:10
**expert** [5] - 4:22, 6:16, 6:19, 6:20, 7:11
**extensive** [1] - 6:14
**extraneous** [1] - 6:6

## F

**fact** [10] - 4:22, 4:25, 5:14, 6:6, 6:16, 7:8, 7:10, 7:11, 7:13, 10:11
**FCRR** [2] - 11:7, 11:8
**February** [1] - 10:7
**FEDERAL** [1] - 2:10
**Federal** [1] - 11:9
**fees** [2] - 8:13, 8:18
**fell** [1] - 8:19
**few** [1] - 4:14
**fighting** [2] - 9:16, 9:19
**file** [3] - 4:9, 5:11, 6:15
**filed** [2] - 5:6, 7:6
**filing** [5] - 4:5, 7:18, 7:19, 7:23, 7:24
**fine** [1] - 4:21
**First** [1] - 7:5
**first** [1] - 9:22
**flying** [1] - 4:6
**foot** [2] - 9:19
**foregoing** [1] - 11:4

**forward** [2] - 4:3, 8:8
**frankly** [1] - 8:20
**free** [1] - 7:17
**Friday** [1] - 10:12
**fully** [1] - 5:15
**functional** [2] - 5:24, 7:15
**functionality** [9] - 4:17, 5:16, 6:2, 6:5, 6:7, 6:12, 6:21, 6:23, 6:24

## G

**GA** [1] - 1:20
**generally** [1] - 10:5
**Georgia** [2] - 3:2, 5:20
**GEORGIA** [1] - 1:7
**Georgia-Pacific** [2] - 3:2, 5:20
**GEORGIA-PACIFIC** [1] - 1:7
**Gilson** [1] - 2:5
**goal** [1] - 8:20
**grants** [1] - 6:11

## H

**hallway** [1] - 4:13
**Handelman** [2] - 2:6, 3:5
**HANDELMAN** [5] - 3:4, 5:13, 6:10, 9:8, 10:17
**happy** [2] - 8:25, 9:6
**Henn** [2] - 1:19, 3:7
**HENN** [16] - 3:7, 3:17, 3:21, 3:24, 4:3, 4:5, 4:9, 4:12, 6:24, 7:5, 7:8, 8:4, 8:9, 8:15, 9:2, 10:18
**Hofer** [1] - 2:5
**hold** [3] - 4:14, 7:17, 7:20
**holiday** [1] - 10:3
**Honor** [8] - 3:4, 3:21, 6:18, 7:5, 8:15, 9:8, 10:17, 10:19
**HONORABLE** [1] - 1:14

## I

**IL** [3] - 1:24, 2:7, 2:12
**ILLINOIS** [1] - 1:4
**Illinois** [1] - 1:9
**injunction** [3] - 3:15, 4:16, 8:16
**instead** [1] - 8:22
**involved** [1] - 8:22
**issue** [13] - 4:17, 4:23, 5:9, 5:15, 5:16, 5:17, 6:3, 6:11, 6:13, 7:12, 7:24, 9:22, 10:9
**issues** [2] - 7:8, 7:10
**itself** [1] - 7:14

## J

**Jeff** [1] - 3:4
**Jeffrey** [1] - 2:6

**John** [2] - 1:23, 3:10
**Jr** [1] - 1:19
**judge** [1] - 9:1
**JUDGE** [1] - 1:15
**Judge** [1] - 9:3
**judgement** [1] - 6:11
**judgment** [12] - 4:16, 4:25, 5:1, 6:4, 6:8, 6:19, 7:9, 7:16, 7:19, 8:2, 9:10, 9:12

## K

**KENDALL** [1] - 1:14
**Keys** [1] - 9:3
**Kilpatrick** [1] - 1:19
**Kimberly** [5] - 2:6, 3:3, 3:5, 5:19, 5:22
**KIMBERLY** [1] - 1:11
**Kimberly-Clark** [5] - 2:6, 3:3, 3:5, 5:19, 5:22
**KIMBERLY-CLARK** [1] - 1:11

## L

**landed** [1] - 4:6
**last** [2] - 4:9, 8:18
**late** [2] - 4:5, 5:6
**law** [1] - 6:5
**lawyered** [1] - 8:19
**lawyers** [1] - 8:22
**learned** [1] - 5:19
**left** [3] - 6:8, 6:10, 7:1
**legally** [1] - 9:17
**LEJA** [2] - 3:10, 10:19
**Leja** [2] - 1:23, 3:10
**likelihood** [1] - 6:13
**Lione** [1] - 2:5
**litigating** [1] - 8:7
**LLP** [2] - 1:19, 1:23
**low** [1] - 8:2
**LP** [1] - 1:8

## M

**magistrate** [2] - 9:1, 9:12
**main** [1] - 8:15
**March** [2] - 10:14, 10:15
**matter** [2] - 6:5, 11:5
**McGuire** [2] - 1:23, 3:10
**mean** [1] - 7:1
**meantime** [1] - 8:1
**mechanical** [1] - 2:24
**mention** [1] - 7:13
**Metzler** [3] - 2:11, 11:7, 11:8
**mind** [1] - 9:18
**minute** [1] - 8:19
**Monday** [1] - 10:13
**money** [2] - 8:20, 9:16

**months** [3] - 4:15, 4:18, 10:6
**morning** [5] - 3:4, 3:6, 3:9, 3:12, 4:13
**motion** [13] - 3:20, 4:16, 5:12, 6:16, 6:17, 6:20, 6:21, 7:18, 7:19, 8:16, 9:11, 10:5
**motions** [3] - 5:1, 9:24, 10:5
**move** [1] - 4:24
**moves** [1] - 5:8
**MR** [23] - 3:4, 3:7, 3:10, 3:17, 3:21, 3:24, 4:3, 4:5, 4:9, 4:12, 5:13, 6:10, 6:24, 7:5, 7:8, 8:4, 8:9, 8:15, 9:2, 9:8, 10:17, 10:18, 10:19

## N

**need** [2] - 5:9, 6:20
**needed** [1] - 5:16
**night** [1] - 4:9
**NORTHERN** [1] - 1:4
**notereading** [1] - 2:25
**nothing** [2] - 6:10, 7:1
**notice** [1] - 4:1
**November** [1] - 10:1
**number** [2] - 3:13, 6:1
**numerous** [2] - 7:6, 7:8

## O

**Obviously** [1] - 8:9
**October** [1] - 9:25
**OF** [2] - 1:4, 1:14
**OFFICIAL** [1] - 2:10
**Official** [1] - 11:9
**one** [4] - 3:25, 4:23, 9:19
**open** [1] - 9:18
**opposition** [1] - 7:24
**originally** [1] - 8:17
**over-lawyered** [1] - 8:19
**owns** [1] - 5:20

## P

**PACIFIC** [1] - 1:7
**Pacific** [2] - 3:2, 5:20
**paper** [2] - 7:14, 7:15
**papers** [1] - 5:4
**particularly** [1] - 6:3
**parties** [3] - 7:6, 7:11
**passing** [1] - 4:3
**patent** [1] - 6:4
**patents** [5] - 5:20, 5:22, 6:3, 7:12, 7:13
**pattern** [1] - 7:14
**Peachtree** [1] - 1:20
**pending** [1] - 6:17
**people** [1] - 8:21
**perspective** [1] - 8:11
**plaintiff** [2] - 3:11, 4:23

**Plaintiff** [2] - 1:9, 1:19
**plaintiff's** [1] - 4:4
**plaintiffs** [3] - 3:8, 3:19, 3:23
**Plaza** [1] - 2:6
**point** [2] - 7:16, 8:15
**position** [1] - 5:11
**potential** [1] - 9:21
**potentially** [1] - 5:14
**practical** [2] - 8:10, 8:14
**precisely** [1] - 6:15
**precluded** [1] - 7:25
**precludes** [1] - 7:16
**preliminary** [3] - 3:14, 4:16, 8:16
**pretty** [1] - 8:13
**problem** [4] - 5:7, 7:18, 7:22, 8:5
**proceed** [2] - 9:10, 9:12
**proceeding** [1] - 7:22
**proceedings** [1] - 11:5
**Proceedings** [1] - 2:24
**produced** [1] - 2:25
**PRODUCTS** [1] - 1:8
**Products** [1] - 3:3
**progress** [1] - 9:9
**proposed** [5] - 3:22, 3:24, 4:20, 5:13, 9:23
**proposing** [1] - 6:15
**push** [1] - 7:20
**put** [4] - 4:14, 7:17, 7:20, 10:7

## R

**rarely** [1] - 9:17
**reach** [1] - 6:13
**ready** [1] - 7:25
**really** [2] - 4:13, 5:4
**reason** [1] - 8:15
**recognize** [1] - 6:2
**record** [1] - 11:5
**recorded** [1] - 2:24
**recrafting** [1] - 7:19
**reflects** [1] - 5:14
**relying** [1] - 6:19
**reply** [2] - 7:24, 10:1
**REPORTER** [2] - 2:10
**Reporter** [1] - 11:9
**represent** [1] - 5:23
**representing** [1] - 3:5
**resolution** [1] - 3:20
**resolve** [3] - 5:10, 7:4, 9:18
**resolved** [4] - 6:23, 8:6, 8:12, 9:22
**response** [2] - 4:1, 4:15
**responsive** [1] - 9:25
**rest** [1] - 7:25
**Rm** [1] - 2:11
**RPR** [3] - 2:11, 11:7, 11:8
**rule** [2] - 9:11, 10:4
**ruled** [1] - 10:5
**ruling** [2] - 6:17, 10:8

## S

**save** [1] - 8:20
**schedule** [9] - 3:22, 4:10, 4:19, 4:20, 5:14, 7:21, 7:23, 9:23, 10:10
**schedules** [1] - 3:24
**see** [5] - 3:25, 5:7, 5:8, 10:6, 10:7
**September** [2] - 1:9, 11:7
**settle** [1] - 8:23
**settlement** [5] - 8:17, 8:21, 9:8, 9:11, 9:17
**settling** [1] - 8:23
**several** [2] - 4:18, 5:20
**sides** [2] - 3:16, 7:10
**significant** [2] - 5:22, 9:9
**sit** [2] - 8:25, 9:6
**someone** [1] - 5:7
**sooner** [1] - 8:12
**South** [1] - 2:11
**specifications** [1] - 6:5
**spending** [2] - 8:6, 9:15
**St** [2] - 1:20, 2:11
**stand** [1] - 3:13
**STATES** [2] - 1:4, 1:15
**status** [2] - 10:6, 10:15
**Status** [1] - 1:10
**STATUS** [1] - 1:14
**stay** [1] - 4:24
**stayed** [1] - 10:4
**Ste** [3] - 1:20, 1:24, 2:6
**stenography** [1] - 2:24
**Stockton** [1] - 1:19
**streamline** [1] - 6:18
**strong** [1] - 5:23
**submissions** [1] - 5:18
**submitted** [2] - 5:13, 7:12
**substantively** [1] - 5:10
**success** [1] - 8:1
**successfully** [1] - 3:20
**suggest** [1] - 7:23
**suited** [1] - 6:3
**summary** [13] - 4:16, 4:25, 5:1, 6:4, 6:8, 6:11, 6:19, 7:9, 7:16, 7:19, 8:2, 9:10, 9:12
**support** [1] - 6:19
**supposedly** [1] - 9:19
**Supreme** [1] - 5:23
**suspended** [1] - 6:17

## T

**teaches** [1] - 5:23
**terms** [2] - 4:21, 7:23
**testimony** [1] - 6:19
**Thanksgiving** [1] - 10:3
**THE** [26] - 1:14, 3:2, 3:6, 3:9, 3:12, 3:18, 3:22, 3:25, 4:4, 4:8, 4:10, 5:4, 6:7, 6:22, 7:1, 7:7, 8:3, 8:5, 8:13, 8:25, 9:3,

9:5, 9:6, 9:14, 10:14, 10:15
**theory** [1] - 6:23
**therefore** [1] - 9:25
**three** [2] - 5:5, 10:6
**threshold** [1] - 6:11
**toilet** [2] - 7:14, 7:15
**tons** [1] - 7:10
**took** [1] - 8:16
**trademark** [1] - 6:25
**trademarks** [1] - 5:21
**TrafFix** [1] - 5:24
**transcript** [2] - 2:24, 11:4
**TRANSCRIPT** [1] - 1:14
**tremendous** [1] - 5:9
**trial** [1] - 8:1
**trouble** [1] - 9:15
**true** [1] - 10:11
**True** [1] - 8:9
**try** [1] - 9:7
**two** [1] - 10:5

## U

**under** [1] - 5:24
**UNITED** [2] - 1:4, 1:15
**up** [2] - 3:14, 4:6
**utility** [3] - 5:20, 5:22, 6:3

## V

**versus** [1] - 3:3
**view** [3] - 5:2, 7:9, 9:8
**VIRGINIA** [1] - 1:14

## W

**Wacker** [1] - 1:24
**well-suited** [1] - 6:3
**win** [2] - 7:9, 8:10
**wins** [1] - 6:24
**withdraw** [1] - 3:15
**withdrawal** [1] - 4:2
**witnesses** [2] - 7:11, 7:12
**Woods** [2] - 1:23, 3:10

**EXHIBIT B**

**EXHIBIT B**
**Georgia-Pacific's Requested Discovery**


**A.      Proposed Document Production Requests:**

1.      Documents concerning the decision to adopt the *Scott Extra Soft Design* for *Scott Extra Soft* bath tissue.

2.      Documents concerning the alternative designs considered for the *Scott Extra Soft* bath tissue.

3.      Documents concerning the costs associated with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

4.      Documents concerning the feasibility of manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

5.      Documents concerning problems with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

6.      Any testing, surveys, or market or consumer research suggesting that the *Scott Extra Soft Design* (or other designs considered as alternatives) improves perceptions of softness, absorbency, durability, strength, or the like.

7.      Documents concerning whether the *Scott Extra Soft Design* assists with avoiding nesting or ridging on bath tissue rolls.

8.      Documents concerning whether the *Scott Extra Soft Design* enhances the bulk of the bath tissue.

9.      Documents concerning whether the *Scott Extra Soft Design* improves the roll structure of the bath tissue.

B.      **Proposed Interrogatories:**

1.      Identify the person(s) most knowledgeable concerning the decision to adopt the *Scott Extra Soft Design* for *Scott Extra Soft* bath tissue.

2.      Identify the person(s) most knowledgeable concerning the alternative design considered for the *Scott Extra Soft* bath tissue.

3.      Identify the person(s) most knowledgeable concerning the costs associated with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

4.      Identify the person(s) most knowledgeable concerning the feasibility of manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

5.      Identify the person(s) most knowledgeable concerning problems with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives.

6.      Identify the person(s) most knowledgeable concerning any testing, surveys, or market or consumer research suggesting that the *Scott Extra Soft Design* (or other designs considered as alternatives) improves perceptions of softness, absorbency, durability, strength, or the like.

7.      Identify the person(s) most knowledgeable concerning whether the *Scott Extra Soft Design* assists with avoiding nesting or ridging on bath tissue rolls.

8.      Identify the person(s) most knowledgeable concerning whether the *Scott Extra Soft Design* enhances the bulk of the bath tissue.

9.      Identify the person(s) most knowledgeable concerning whether the *Scott Extra Soft Design* improves the roll structure of the bath tissue.

C.      **Proposed Rule 30(b)(6) Deposition Topics:**

1.      Kimberly-Clark's decision to adopt the *Scott Extra Soft Design* for *Scott Extra Soft* Bath tissue;

2.      Any alternative designs considered for the *Scott Extra Soft* bath tissue;

3.      The costs associates with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives;

4.      The feasibility of manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considered as alternatives;

5.      Problems with manufacturing bath tissue with the *Scott Extra Soft Design*, including other designs considering as alternatives;

6.      Any testing, surveys, or market or consumer research suggesting that the *Scott Extra Soft Design* (or other designs considered as alternatives) improves perceptions of softness, absorbency, durability, strength, or the like;

7.      Whether the *Scott Extra Soft Design* assists with avoiding nesting or ridging on bath tissue rolls;

8.      Whether the *Scott Extra Soft Design* enhances the bulk of the bath tissue; and

9.      Whether the *Scott Extra Soft Design* improves the roll structure of the bath tissue.