IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP,<br><br>       Plaintiff,<br> v.<br><br>KIMBERLY-CLARK CORPORATION, KIMBERLY-CLARK GLOBAL SALES, INC., and KIMBERLY-CLARK WORLDWIDE, INC.,<br><br>       Defendants. | Case No. 09 C 2263<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff Georgia-Pacific Consumer Products, LP ("Georgia-Pacific") filed suit against Defendants Kimberly-Clark Corporation, Kimberly-Clark Global Sales, Inc., and Kimberly-Clark Worldwide, Inc. (collectively "Kimberly-Clark") alleging unfair competition and trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and under various state statutes. The suit alleges that Kimberly-Clark has introduced bath tissue products with designs that infringe Georgia-Pacific's protected rights in its "Quilted Diamond Design." Georgia-Pacific has moved to strike the proposed testimony of two of Georgia-Pacific's experts, Ivan Ross ("Ross") and David C. Hilliard ("Hilliard"). For the reasons set forth below, Georgia-Pacific's Motion to Strike the Survey and Expert Report of Ivan Ross is denied, and Georgia-Pacific's Motion to Strike the Expert Report of David C. Hilliard is granted.

**STANDARD OF REVIEW**

Whether scientific expert testimony is admissible is determined by reference to Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Kimberly-Clark, as the proponent of Little's testimony, bears the burden of proof with respect to whether the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

Rule 702 assigns the trial judge "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 492 F.3d at 597. The focus of this decision "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 492 F.3d at 595. The Seventh Circuit has developed a three-step analysis for determining the admissibility of expert testimony under Rule 702. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.'" *Id.* (quoting Fed.R.Evid. 702). Second, "the expert's reasoning or methodologies underlying the testimony must be scientifically reliable." *Id.* Third, the expert's testimony must be relevant, that is, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

**DISCUSSION**

**I. Georgia-Pacific's Motion to Strike the Survey and Expert Report of Ivan Ross**

Ivan Ross is a consumer psychologist who was a professor of marketing at the University of Minnesota for nearly thirty years. He was retained by Kimberly-Clark to conduct a survey related to the likelihood of consumer confusion between Georgia-Pacific and Kimberly-Clark's products.

Ross's expert report is based solely on the survey described below. The admissibility of the survey is therefore dispositive of the admissibility of Ross's proposed testimony.

Georgia-Pacific does not challenge Ross's qualifications to offer testimony as a consumer psychology expert, or his qualifications in the field of survey design generally. Instead, Georgia-Pacific argues that the methodology used in the creation, administration, and evaluation of the survey used here was so flawed as to render it inadmissible under *Daubert* and its progeny.

Survey evidence offered in support of, or in opposition to, summary judgment "must comply with the principles of professional survey research; if it does not, it is not even admissible . . . ." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007). Surveys testing consumer confusion should mimic market conditions, including the context in which purchases are made. *See Coherent, Inc. v. Coherent Techs.*, 935 F.2d 1122, 1126 (10th Cir. 1991) (rejecting survey that did not appropriately mirror market conditions); *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) ("[A] survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace.").

Here, a survey designed by Ross was conducted by a private survey firm as a double-blind study in which participants were intercepted from among shoppers in eight United States shopping malls. (*See* R. 74, Ex. A, Expert Report of Ivan Ross, at 5, 6.) (hereinafter "Ross Rep.") The relevant universe of individuals to whom the survey was administered was defined as recent users of Northern toilet tissue (Georgia-Pacific's brand) who were 18 years or older and met a variety of screening criteria. (*See* Ross Rep. at 6.) "In order to qualify for participation in the study the respondent had to indicate that Northern or Quilted Northern was the brand or among the brands of

3

toilet tissue he/she had used in the past three months." (Ross Rep. at 7.) Participants were then taken to an interview room where they were shown toilet tissue samples and asked a series of questions. (*See* Ross Rep. at 8-11.) Some respondents were shown one of two different brands of toilet tissue manufactured by Kimberly-Clark, while others were shown a product manufactured by Charmin and "not alleged to be confusing as to source . . . ." (Ross Rep. at 5.) After coding and analyzing the survey responses, Ross ultimately concluded that there was no demonstrated confusion between the two Kimberly-Clark tissue brands and the Georgia-Pacific brand "that cannot be accounted for by extraneous factors." (Ross Rep. at 14.) Georgia-Pacific argues that the survey is so unreliable as to be inadmissible because it failed to identify a proper and relevant universe, because it was not properly validated, and because it was not coded on a "blind" basis.

A.  Identification of the "Universe"

The probative value of a survey depends in large part upon the "universe" of respondents, and the reliability of the survey is diminished if the universe of desired respondents is erroneous or undefined. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 n.5 (7th Cir. 1992) (noting that a survey designed to demonstrate secondary meaning had failed to target all relevant purchasers); *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) (a valid survey must interview individuals who "adequately represent the opinions which are relevant to the litigation"). The legal inquiry as to whether an allegedly infringing product has caused consumer confusion "centers on the confusion of consumers in the market for the particular products at issue," *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996). However, "in addition to point-of-sale confusion about the source of products and services . . . the Lanham

4

Act's protections also extend to post-sale confusion of potential customers." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001).

Here, Ross defined the relevant universe as "recent past (3 months) users of Northern toilet tissue who were 18 years or older, who had not participated in a study about paper products in the past three months, who did not live in a household with or have a member of their immediate family who worked for an advertising agency or marketing research department or company, a company that makes paper products such as toilet tissue, or a store in the mall where the research was being conducted and who, if they wore vision aides for reading, had them at the time they were approached." (Ross Rep. at 6.) Although Ross does not define this universe as comprising "potential customers" but instead merely of "users," *see Dorr-Oliver*, 94 F.3d at 382, because toilet paper is such a widely consumed product and the survey participants were familiar with the products at issue, they might be viewed as potential customers so as to make the survey probative in the post-sale confusion context. *See CAE*, 267 F.3d at 683 ("Post-sale confusion refers to a situation in which, for example, a potential customer sees a product bearing the label 'CAE Rental Equipment' and, consistent with the customer's familiarity with CAE, Inc., mistakenly attributes the products to CAE, Inc."); *compare Dorr-Oliver*, 94 F.3d at 382-83 (finding that where the market for the product at issue was limited to "12 customers in the corn wet milling industry," evidence showing that the general public might be confused did not reflect the views of these 12 "potential customers" in the post-sale confusion context). Moreover, any flaw in Ross's definition of the relevant universe of survey-takers does not render his report inadmissible, but merely go to the survey's probative value and the weight that the jury should accord to that survey. *See Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930-31 (7th Cir. 1984) (where defendant objected to the universe used for

a survey, the court held that problems with the universe making the survey "less probative on the issue of confusion" go "to the weight to be given the survey results, not the admissibility of the survey"); *see also Southland SOD Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) ("Technical unreliability goes to the weight accorded to a survey, not its admissibility.") (quoting *E &J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)); *Spraying Systems Co.*, 975 F.2d at 893 n.5 (noting that where "the surveys targeted as respondents farmers rather than actual purchasers of the spraying equipment," "the selection of farmers only as the relevant universe limit[ed] the surveys' probative value").

B.  Selection of the Sample Population

Once a universe is identified, a reliable survey must select a sample population that accurately represents the universe.  An underinclusive sample population seriously diminishes the reliability of the survey.  *See, e.g., Jaret Intern., Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 74 (E.D.N.Y. 1993) (finding a consumer confusion survey unreliable because of, among other flaws, "its unrepresentative sample and its untrustworthy methodology.").

Ross's survey report notes that the sample of respondents "is representative of target demographics, 13% younger male [age 18-39], 7% older male [age 40+], 39% younger female [age 18-39], and 41% older female [age 40+]." (Ross Rep. at 12.)  He does not explain, however, how a sample that is 70% female is representative of an identified universe consisting of toilet paper users, or why this gender-skewed sample is "representative" of an undefined "target demographic." This factor therefore casts doubt on the reliability of the sample population to whom the survey was administered, even if the universe of toilet-paper users were deemed the correct one, but does not render the survey inadmissible.  *See Piper Aircraft*, 741 F.2d at 930-31.

C. Post-Survey Validation

After the interviewing phase of the survey, follow-up telephone calls were made to all respondents who had provided contact information. (*See* Ross Rep. at 11.) Fifty-three percent of the survey respondents were successfully reached and their participation validated by an indication that they had participated in the survey and were qualified as respondents. (*See id.*) Six percent of respondents were reached but indicated that they had not participated or were not qualified to participate. (*See id.*) Forty-one percent of respondents, or 188 out of a total of 456, could not be reached.

Georgia-Pacific challenges Ross's decision to treat the 41% of respondents who were unreachable as validated interviews, which he explained was "customary." (*See id.*) Validation is conducted after the completion of a consumer survey in order to identify problems with the work of hired interviewers, and requires that a different person call "the respondent at the number recorded on the questionnaire to make sure that the respondent exists and that the interview was in fact conducted." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 323 (S.D.N.Y. 2000). Ross provides no support for his assertion that it is customary to treat unreachable respondents as having submitted valid survey response, and such treatment appears to contradict the purpose of the validation process. The Court finds the failure to validate the participation of more than 40% of survey respondents a factor that weakens the overall reliability of the survey's conclusions. Again, however, "[t]echnical unreliability goes to the weight accorded to a survey, not its admissibility." *See Southland*, 108 F.3d at 1143.

### D. Data Evaluation

Steps must be taken to ensure that data are classified and recorded consistently and accurately. The data collected from the survey were tabulated independently by Ross and an individual at the survey-administration firm. (*See* Ross Rep. at 12.) The responses of each individual respondent were viewed "as a whole" in order to determine "whether any part of [a respondent's answers] indicated confusion . . . for trademark relevant reasons." (*Id.*) Georgia-Pacific claims that this process was fundamentally flawed because Ross was aware of both the sponsor and the purpose of the study at the time that he conducted his subjective evaluation of the survey results.

It is true that survey responses, to be reliable, must "be recorded and interpreted in an unbiased manner." *Simon Prop. Group*, 104 F. Supp. 2d at 1038. Georgia-Pacific's complaint about Ross's evaluation of the survey data, however, does not contest the manner in which survey responses were recorded by the survey administrators themselves. Instead, Georgia-Pacific challenges Ross's interpretation of the data, that is, his classification of whether the responses indicated a trade-secret relevant reason for consumer confusion. Georgia-Pacific has not presented any authority supporting the proposition that an expert in the field of consumer psychology may not evaluate properly recorded data in a less than purely objective way, applying the lens of his own experience and expertise. Moreover, any concerns that Ross's knowledge of the purpose of the survey improperly tainted his evaluation of the data are mitigated by the fact that the survey-firm administrator also classified and tabulated the responses, and Georgia-Pacific could use those independent evaluations of the data for cross-examination purposes.

E. Factors Supporting the Admissibility of the Survey

  1. *Clear, Precise, and Unambiguous Questions*

A reliable survey should avoid the use of confusing or ambiguous questions. *See, e.g., Nat'l Football League Props., Inc v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999) (survey consisting of only one vague question, with no controls or comparison questions, excluded from evidence). Georgia-Pacific does not challenge the questions used here as impermissibly vague or ambiguous, and the Court's review of the content of the survey shows the questions to be clear. Thus, the survey administered by Ross appears to have complied with this professional standard.

  2. *Use of Filter Questions*

Some respondents to a survey will not have an opinion on a question asked, which can result in a respondent guessing as to the "right" answer. Reliable surveys address this issue through the use of filter questions and "don't know" or "no opinion" answer alternatives. *See, e.g., LG Elecs. USA, Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 954 (N.D. Ill. 2009) (finding that a survey's inclusion of a "don't know" option as an answer to an otherwise close-ended question was sufficient to mitigate concerns about its reliability). Here, interviewers told respondents not to guess if they did not have an answer, but simply to give a "don't know" or "don't have an answer" response. (*See* Ross Rep. at 9.) The survey thus complies with this standard, and no reliability doubts arise because of it.

  3. *Use of a Double-Blind Study*

In order to ensure their objectivity, reliable surveys are conducted using double-blind research methodology whenever possible. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Cons. Pharms. Co.*, 290 F.3d 578, 590-91 (3rd Cir. 2002) (upholding the district

court's reliance on a survey "during which both the respondents and the interviewers [were] unaware of the purpose of the survey or its sponsor.")  Ross's report reflects that an independent firm administered the survey and recorded the raw data, and Georgia-Pacific does not argue that survey administrators were aware of either the survey's purpose or its sponsor.  Therefore, this factor appears to support the reliability of the study.

      F. Conclusion

On balance, the Court finds that the overall methodology used to conduct the survey is adequate to support its admissibility under *Daubert* and Federal Rule of Evidence 702.  Here, as is so often the case, "shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).  Because the survey is admissible and Ross's expert report does nothing more than explain and analyze the survey, his report is also admissible.  Georgia-Pacific's Motion to Strike the Survey and Expert Report of Ivan Ross is therefore denied.

**II.  Georgia-Pacific's Motion to Strike the Expert Report of David C. Hilliard**

David Hilliard ("Hilliard") is a Chicago intellectual property attorney who has prepared an expert report analyzing whether Georgia-Pacific's "Quilted Diamond Design" is functional and therefore not a valid trademark.  Georgia-Pacific moves to strike the report on the grounds that it is "nothing more than a legal brief setting forth legal arguments in the guise of an expert report." (R. 69, Ex. 1, Pl. Br. in Supp. of Mtn. to Strike, at 2.)  Georgia-Pacific does not contest Hilliard's qualifications to testify as an expert in the field of intellectual property law or the methodology by which he reached the conclusions contained in his report, so the Court will focus its analysis on the issue of whether his testimony is relevant to the trier of fact.  *See United States v. Moore*, 521 F.3d

681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists.").

While experts may offer testimony that "embraces an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704, expert testimony that is "largely on purely legal matters and made up of solely legal conclusions" is inadmissible. *Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Expert witnesses may not testify as to the meaning of applicable legal standards. *See Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994) (improperly admitted legal testimony "left the jury adrift and permitted it to return a verdict on a basis that may have been legally and factually flawed").

The fact that Hilliard's testimony references various statutes and uses certain terms that also have legal import is not a reason, by itself, to bar his opinions as constituting impermissible legal conclusions. *See, e.g., Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059 (9th Cir. 2008) (experts may properly "refer to terminology from applicable law in expressing their opinions"). However, it is clear that the report does contain numerous legal conclusions. For example, Hilliard writes that the "Quilted Diamond Design is invalid as a trademark—and hence unprotectable and unenforceable under trademark law—pursuant to the doctrine of trademark functionality." (R. 69, Ex. 2-1, Expert Report of David C. Hilliard, at 4.) (hereinafter "Hilliard Rep.") He further writes that "the Quilted Diamond Design serves a central utilitarian purpose within the terms of" certain relevant patents, "and is therefore invalid as a trademark under the doctrine of functionality." (Hilliard Rep. at 14.)

Kimberly-Clark's response in support of Hilliard's report assumed that the report would be presented only to the Court, as the finder of fact, in the course of a preliminary injunction hearing.

11

Georgia-Pacific has now withdrawn its Motion for a Preliminary Injunction, (*see* R. 121), and the case has proceeded to briefing on Kimberly-Clark's Motion for Summary Judgment. Thus, the admissibility of Hilliard's report must be considered with reference to the jury to whom it may eventually be presented. When the jury is the finder of fact, "[e]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepard Manor Found.*, 323 F.3d at 564.

Kimberly-Clark argues that the quoted statements above and one other comment regarding the functionality doctrine are the only opinions about which Georgia-Pacific complains, and that the report as a whole should therefore not be excluded. However, Georgia-Pacific's Motion makes it clear that the three quoted statements are only examples of the inadmissible legal conclusions that Hilliard makes, and are not intended to be the sole focus of their challenge. Georgia-Pacific does not specifically quote the concluding paragraph of Hilliard's report, for example, which states that "Georgia-Pacific's trademark registrations for the Quilted Diamond Design are invalid and subject to cancellation[,]" but this is as much a legal conclusion as the other opinions referenced above. (Hilliard Rep. at 27.) Once Hilliard's impermissible legal conclusions are excluded, little remains in his expert report that would be of value to the jury beyond a review of evidence for which fact witnesses could easily provide an adequate foundation. The remainder of his report is thus excluded as not an appropriate subject of expert witness testimony under Federal Rule of Evidence 702.

Georgia-Pacific's Motion to Strike the Expert Report of David C. Hilliard is therefore granted.

## CONCLUSION AND ORDER

Ivan Ross's survey regarding potential consumer confusion is admissible in spite of certain methodological flaws, which properly go to its weight rather than its admissibility. As Ross's expert report does nothing more than explain and analyze the survey, his report is also admissible. However, David Hilliard's report consists primarily of impermissible legal conclusions that once excluded leave little of value to the jury in his report, and his report is therefore barred.

Georgia-Pacific's Motion to Strike the Survey and Expert Report of Ivan Ross is denied. Georgia-Pacific's Motion to Strike the Expert Report of David C. Hilliard is granted.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 31, 2010