IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, | ) ) ) |  |
| Plaintiff, | ) | Case No. 09 C 2263 |
| v. | ) ) | Judge Virginia M. Kendall |
| KIMBERLY-CLARK CORPORATION, KIMBERLY-CLARK GLOBAL SALES, INC., and KIMBERLY-CLARK WORLDWIDE, INC., | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## MEMORANDUM OPINION AND ORDER

Plaintiff Georgia-Pacific Consumer Products, LP ("Georgia-Pacific") filed suit against Defendants Kimberly-Clark Corporation, Kimberly-Clark Global Sales, Inc., and Kimberly-Clark Worldwide, Inc. (collectively "Kimberly-Clark") alleging unfair competition and trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and various state statutes. The suit alleges that Kimberly-Clark has introduced bath tissue products with designs that infringe Georgia-Pacific's protected rights in its "Quilted Diamond Design." Kimberly-Clark moves for summary judgment on the grounds that the Quilted Diamond Design is functional, and therefore cannot be protected as a registered trademark. For the reasons set forth below, Kimberly-Clark's Motion for Summary Judgment is granted.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>[1]

## I.    The Parties

Georgia-Pacific, a Delaware limited partnership headquartered in Atlanta, Georgia, manufactures a variety of home and commercial paper products that are sold throughout the United States.  (Pl. 56.1 Resp. ¶ 1.)  The Kimberly-Clark entities are Delaware corporations with operation facilities in Neenah, Wisconsin; they are direct competitors of Georgia-Pacific in the bath-tissue market.  (Pl. 56.1 Resp. ¶ 2.)

## II.    The Products

Georgia-Pacific manufactures and sells a brand of bath tissue, called Quilted Northern, that is embossed with a "Quilted Diamond Design."  (Pl. 56.1 Resp. ¶ 6.)  Georgia-Pacific asserts that its rights in the Quilted Diamond Design are protected by four United States trademark registrations: Reg. No. 2,710,741; Reg. No. 1,778,352; Reg. No. 1,806,076; and Reg. No. 1,979,345.  (Pl. 56.1 Resp. ¶ 9.)  Georgia-Pacific also owns numerous federal trademark registrations using the "Quilted" and "Quilted Northern" marks.  (Pl. 56.1 Resp. ¶ 9.)  The packaging of the Quilted Northern product states that the product is made under both utility and design patents and protected by trademark registrations.  (Pl. 56.1 Resp. ¶ 48.)

Kimberly-Clark sells two brands of bath tissue that allegedly infringe Georgia-Pacific's rights in the Quilted Diamond Design—"Cottonelle Ultra" and "Scott Kimberly-Clark Professional."  (Pl. 56.1 Resp. ¶¶ 7-8.)  In addition, recently Kimberly-Clark re-launched its Scott® Extra Soft tissue,

---

[1]  Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Kimberly-Clark's Statement of Uncontested Facts have been abbreviated to "Def. 56.1 Ex. __."; citations to Georgia-Pacific's Response to Kimberly-Clark's Statement of Uncontested Facts have been abbreviated to Pl. 56.1 Resp. ¶ __."; and citations to Kimberly-Clark's Response to Georgia-Pacific's Statements of Additional Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."

which Georgia-Pacific claims is very similar to its Quilted Diamond Design.

## III.  The Trademarks

In support of its claims, Georgia-Pacific asserts the following four United States trademark registrations, as well as numerous trademark registrations incorporating the word marks "Quilted" and "Quilted Northern."  (Pl. 56.1 Resp. ¶ 9; Def. 56.1 Resp. ¶ 1.)  These trademarks are set forth below.



Reg. No. 2,710,741        Reg. No. 1,778,352        Reg. No. 1,806,076        Reg. No. 1,979,345

Although Registration No. 2,710,741 depicts the Quilted Diamond Design with neither flowers nor hearts in any of the diamond-shaped cells, the only manner in which the Quilted Diamond Design has been used by itself, without any flowers or hearts, is on the packaging for Quilted Northern tissue.  (Def. 56.1 Resp. ¶ 20.)

## IV.  The Utility Patents

In addition to its federal trademark registrations, Georgia-Pacific owns five United States utility patents that are relevant to the dispute over the functionality of the Quilted Diamond Design. They are numbered 5,436,057 (the "'057 Patent"); 5,573,830 (the "'830 Patent"); 5,597,639 (the "'639 Patent"); 5,620,776 (the "'776 Patent"); and 5,874,156 (the "'156 Patent").  (Pl. 56.1 Resp.

¶ 10.)

The lattice design that is the subject of trademark Reg. 2,710,741 is depicted in each of the utility patents enumerated above. (Pl. 56.1 Resp. ¶ 13.) Specifically, it is shown in Figure 1 of the '776 and '830 Patents and in Figure 5 of the '639, '057, and '156 Patents. (Pl. 56.1 Resp. ¶ 14.) Similarly, the design of trademark Reg. 1,778,352 is shown in Figure 1 of the '776 and '830 Patents and in Figure 5 of the '639, '057, and '156 Patents. (Pl. 56.1 Resp. ¶¶ 15, 52, 59.)

### A. '639 and '156 Patents

Both the '639 and '156 Patents are titled "HIGH SOFTNESS EMBOSSED TISSUE." (Pl. 56.1 Resp. ¶¶ 21, 22.) The '639 Patent was granted on January 28, 1997, and the '057 Patent was granted on February 23, 1999. (Pl. 56.1 Resp. ¶¶ 21, 22.) Both the '639 and '156 Patents include a diamond lattice design with a floral pattern in some of the diamond cells. (Pl. 56.1 Resp. ¶ 27.)

The abstracts of the '639 and the '156 Patents state as follows: "The perceived softness of embossed tissue can be increased greatly while avoiding nesting when a particular pattern is embossed into the tissue. This pattern combines relatively shallow stitchlike bosses with deeper more sharply defined signature bosses. The stitchlike bosses can be rounded and arranged in wavy flowing intersecting lines. The signature bosses can be arranged in regions framed by the intersecting wavy flowing lines." (Pl. 56.1 Resp. ¶ 24.) Further, the '639 and '156 Patents state that "[i]n a most preferred embodiment, the cells are diamond shaped." (Pl. 56.1 Resp. ¶ 28.)

Moreover, the "Background of Invention" for the '639 and '156 Patents states: "[a] primary advantage of the present invention is to provide an embossed tissue which avoids buildup and ridging problems while heightening the consumer's perception of softness." (Pl. 56.1 Resp. ¶ 29.) The Background further mentions that the combination of the stitchlike bosses and signature bosses

provides "very good roll structure [that does] not exhibit the ridging effect found with prior art embossed tissue patterns." (Pl. 56.1 Resp. ¶ 31.) Finally, the Background notes that "[s]ignature and finishing bosses in regions framed by the intersecting flowing lines serve to greatly enhance the bulk of the tissue while also enhancing the distortion of the surface thereof." (Pl. 56.1 Resp. ¶ 33.)

## B.    '057 Patent

The '057 Patent is titled "HIGH SOFTNESS EMBOSSED TISSUE WITH NESTING PREVENTION EMBOSSED PATTERN," and was granted on July 25, 1995. (Pl. 56.1 Resp. ¶ 23.) The '057 Patent, as depicted in Figure 5, includes a diamond lattice design with a floral pattern in some of the diamond cells, and as shown below, is the same design as the '639 and '156 Patents. (Pl. 56.1 Resp. ¶ 27.) The abstract of the '057 Patent states: "This invention relates to the discovery that the perceived softness of embossed tissue can be increased greatly while avoiding prior art nesting problems if a particular pattern is embossed into the tissue. This pattern combines relatively shallow stitchlike debossments with deeper more sharply defined signature debossments. The stitchlike debossments are rounded and arranged in wavy flowing intersecting lines. The signature debossments are arranged in regions framed by the intersecting wavy flowing lines." (Pl. 56.1 Resp. ¶ 25.) Moreover, the '057 Patent states that "[i]n a most preferred embodiment, the cells are diamond shaped." (Pl. 56.1 Resp. ¶ 28.) The "Background of Invention" for Patent '057 states: "[t]he present invention provides an embossed tissue which avoids buildup and ridging problems while heightening the consumer's perception of softness." (Pl. 56.1 Resp. ¶ 30.) The Background further states that "[s]ignature debossments in regions framed by the intersecting wavy flowing lines serve to greatly enhance the bulk of the tissue while also enhancing the distortion of the surface." (Pl. 56.1 Resp. ¶ 34.)

'639, '057, and '156 Patents                           Trademark Reg. No. 1,806,076



### C.      '776 and '830 Patents

The '776 Patent is titled "EMBOSSED TISSUE PRODUCT WITH A PLURALITY OF

EMBOSS ELEMENTS," and the '830 Patent is titled "HIGH BULK EMBOSSED TISSUE WITH

NESTING PREVENTION."  (Pl. 56.1 Resp. ¶¶ 49, 50.)  The abstracts of the '776 and '830 Patents

state: "An embossed tissue having improved bulk and puffiness while being non-nesting by having

a lattice pattern and at least two signature bosses. More particularly, one of the signature bosses is

defined by embossments having a lower portion which is continuous and an upper portion which is

defined by crenels and merlons." (Pl. 56.1 Resp. ¶ 51.)  Georgia-Pacific's Trademark Registration

No. 1,979,345, is depicted in Figure 1 and 14 of the '776 and '830 Patents (Pl. 56.1 Resp. ¶ 59.)

| '776 and '830 Patents | Trademark Reg. No. 1,979,345 |
| --- | --- |




The Patents disclose that uniform roll structure is improved when the two signature emboss patterns are non-nesting. (Pl. 56.1 Resp. ¶ 67.) The "Summary of Invention" for the '776 and '830 Patents states: "[t]he present invention provides an embossed paper product which is significantly higher in bulk than prior art products. When formed into a roll, the embossed paper products of the present invention has superior roll compression and improved roll structure." (Pl. 56.1 Resp. ¶ 62.)

### D. Facts Pertaining to Construction of Utility Patents

Many of Georgia-Pacific's responses to Kimberly-Clark's 56.1 facts offer disputed interpretations of the claims and specifications of the utility patents. Kimberly-Clark's responses to Georgia Pacific's proposed facts also represent lengthy arguments regarding the proper construction of the claims of the patents, and do not constitute factual assertions. Claim construction is a legal issue, not a factual one. A party may not include legal opinions or conclusions of law in

its statement of facts in support of summary judgment. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("Local Rule 56.1 requires that statements of facts concerning summary judgment motions identify the evidence supporting a party's factual assertions. It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("Cady's resubmitted statement of material facts also did not comply with Rule 56.1 as it failed to adequately cite the record and was filled with . . . legal arguments."). The Court will address the proper interpretation of the claims of the utility patents in its analysis.

## V.      The Design Patents

Georgia-Pacific owns nine design patents covering designs consisting of diamond shapes, separated by wavy borders, with various combinations of heart and flower emblems within the diamonds of the pattern. (Def. 56.1 Resp. ¶ 2.) Three of these design patents remain active and non-expired: Nos. D373,905; D377,419; and D405,269. (Def. 56.1 Resp. ¶ 2.)

## VI.     The Quilted Diamond Design's Qualities

Various portions of the utility patents reflect that embossing designs on bath tissue improves its "bulk, appearance and perceived softness" and that embossing sheets that have multiple plies of creped tissue enhances "their bulk and moisture holding capacity." (Def. 56.1 Resp. ¶ 15.) The utility patents reflect that one of the improvements of the claimed inventions is that they result in bath tissue rolls with enhanced bulk. (Def. 56.1 Resp. ¶ 24.) Conversely, however, embossing bath tissue may decrease its strength and allow it to tear more easily when in use. (Def. 56.1 Resp. ¶ 22.) Additionally, embossing bath tissue may improve its absorption rate as compared to non-embossed tissue. (Def. 56.1 Resp. ¶ 25.) Finally, embossing the tissue can enhance its softness and comfort.

(Pl. 56.1 Resp. ¶ 37.)[2]

The particular emboss that creates the Quilted Diamond Design does not make the tissue any stronger than that using other emboss patterns; the same level of strength can be achieved by using any number of alternative emboss patterns. (Def. 56.1 Resp. ¶ 23.)

## VII. The Advertisements

Georgia-Pacific advertises Quilted Northern bath tissue with slogans including: "Quilted to created thousands of places for moisture to go"; "Quilted to absorb"; " . . . quilted together to give . . . exceptional softness and comfort"; "New Softer Quilting"; and " . . . unique new quilted design for more quilting and comfort than ever before." (Pl. 56.1 Resp. ¶ 72.)

## VIII. The Prior Litigation

Georgia-Pacific's predecessor-in-interest filed a lawsuit against Kimberly-Clark in 1998, alleging in relevant part that one of Kimberly-Clark's bath tissue designs infringed Georgia-Pacific's rights in the Quilted Diamond Design. (Def. 56.1 Resp. ¶ 5.) Kimberly-Clark raised functionality as an affirmative defense in that litigation. (Def. 56.1 Resp. ¶ 6.) The parties reached a settlement agreement in 2000, under which Kimberly-Clark agreed to drop its pending Trademark Trial and Appeal Board cancellation proceedings. (Def. 56.1 Resp. ¶ 7.) The settlement also provided, however, that it would "not limit, in any manner, Kimberly-Clark's ability to challenge the validity of the [Quilted Diamond Design] or to defend itself in any future action brought by Georgia-Pacific asserting the [Quilted Diamond Design] against Kimberly-Clark." (Def. 56.1 Resp. ¶ 7.)

Kimberly-Clark has competed with Georgia-Pacific in the marketplace for years without

---

[2] Georgia-Pacific contends that a wide variety of patterns could achieve these functional benefits. Georgia-Pacific's argument that many patterns increase absorption, softness, and comfort does not contradict Kimberly-Clark's proposed facts relating to the functional benefits of the Quilted Diamond Design itself.

using designs that allegedly infringe the Quilted Diamond Design.  (Def. 56.1 Resp. ¶ 33.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

Kimberly-Clark moves for summary judgment on the basis that the designs at issue are functional, and therefore not protected under the Lanham Act.  The Court should grant a summary judgment motion if the defendant can establish that the design at issue is functional.  *TrafFix*

*Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 297 (7th Cir. 1998).

A threshold issue is whether Kimberly-Clark can assert the functionality defense in light of Georgia-Pacific's "incontestable" trademark registrations that cover the Quilted Diamond Design. Specifically, Georgia-Pacific's Trademark Registration Nos. 2,710,741; 1,806,076; 1,778,352; and 1,979,345 are "incontestable" under 15 U.S.C. § 1065. In a trademark infringement suit, this designation frees the owner of a mark from having to show that the mark is distinctive. *See Jay Franco & Sons, Inc. v. Franek*, 09-2155, 2010 WL 3156539, at *2 (7th Cir. Aug. 11, 2010). Even an incontestable mark, however, is subject to the functionality defense, but the party seeking to invalidate the trademark has the burden of proof. *See* 15 U.S.C. 1115(b)(8); *Eco Mfg. LLC v. Honeywell Int'l Inc.*, 357 F.3d 649, 651 (7th Cir. 2004). Therefore, Kimberly-Clark can assert a functionality defense against the trademarks despite their incontestable status.

The functionality doctrine eliminates trademarks on "useful" designs, which maintains the integrity of trademark and patent law because trademarks last forever and patents are valid only for a specific period of time. *See Franek*, 2010 WL 3156539, at *2. The functionality analysis is factual and the traditional rule is that a feature is functional, and therefore not a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32. An alternative test for analyzing cases involving "esthetic" functionality is the "competitive necessity test," where the inquiry centers around whether a feature creates a "significant non-reputation-related disadvantage." *Id.* at 32 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)); *Franek*, 2009 WL 674269, at *10. If the traditional test is met, however, there is no need to analyze the feature under the "competitive necessity" test or "speculat[e] about other

design possibilities." *TrafFix*, 532 U.S. at 33-34.

The issue of whether an item is functional can be broken down to five factors. *See, e.g., Specialized Seating, Inc. v. Greenwich Indus., L.P.*, 472 F. Supp. 2d 999, 1011 (N.D. Ill. 2007) (Holderman, C.J.). Functionality turns on: "(1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements;[3] (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost." *Id.*

Under the Lanham Act, registration of a trademark creates a rebuttable presumption that the mark is valid, but this presumption "evaporates as soon as evidence of invalidity is presented." *Door Sys. Inc. v. Pro-Line Door Sys. Inc.*, 83 F.3d 169, 172 (7th Cir. 1996) When a party presents strong evidence that a trademark is functional, this creates a "heavy burden" on the opposing party to point out contrary evidence of nonfunctionality. *TrafFix*, 532 U.S. at 29-30.

In sum, Kimberly-Clark asserts that the trademarks covering the Quilted Diamond Design overlap with the '057, '156, '639, '776, and '830 utility patents, and therefore are "strong evidence" of functionality. (R. 126, Kimberly-Clark Mot. for Summary Judgment 9.) Likewise, Kimberly-Clark claims that Georgia-Pacific's advertising efforts consistently highlight the useful qualities of the Quilted Diamond Design. Kimberly-Clark also emphasizes that the Quilted Diamond Design offers numerous utilitarian benefits, such as increased softness and bulk, and better roll structure. In contrast, Georgia-Pacific argues that the utility patents refer to its manufacturing methods that

---

[3] This factor was not raised by the parties as a point that is in dispute. Because there is not relevant evidence on this issue, it will not factor into the Court's analysis.

12

achieve the utilitarian benefits, not the design itself. Similarly, Georgia-Pacific contends that any reference to the Quilted Diamond Design in the utility patents is incidental to the claimed invention. Furthermore, Georgia-Pacific points out that the Quilted Diamond Design affects neither cost nor quality of the bath tissue, and thus serves no useful purpose. Finally, according to Georgia-Pacific, the availability of numerous alternative designs in the market that provide a comparable level of softness or bulk creates a genuine issue of material fact as to whether competitors "need" the Quilted Diamond Design in order to vigorously compete in the sale of bath tissue.

## I.    Utility Patents

The existence of a utility patent that covers the asserted designs can be a "cheat sheet" for deciding whether a design is useful, and therefore functional. *Jay Franco*, 2010 WL 3156539, at *2. If the "central advance" claimed in the utility patent matches the "essential feature" of the trade dress or trademark, that constitutes strong evidence that the design is functional. *TrafFix*, 532 U.S. at 30. Satisfying this requirement places a "heavy burden" on the trademark owner to show nonfunctionality. Specifically, the owner of the trademark can overcome the burden by showing that the design at issue is an "ornamental, incidental, or arbitrary aspect of the device." *TrafFix*, 532 U.S. at 30; *see, e.g., Berlin Packaging, LLC, v. Stull Tech., Inc.*, 381 F. Supp. 2d 792, 799 (N.D. Ill. 2005) (Denlow, M.J.).

In order to recognize a utility patent in the analysis for functionality, the Court must find that the "central advance" of the claims in the utility patents match the "essential feature" of the trademark. *TrafFix*, 532 U.S. at 30; *Franek*, 2009 WL 674269, at *12. In other words, the utility patent inquiry focuses on whether the feature of the trademark at issue is the same as the claims of the utility patent.

The essential feature of Georgia Pacific's trademarks is the Quilted Diamond Design, which is embossed on its bath tissue. The diamond shape, which regularly features a floral or heart motif, gives the bath tissue a quilt-like appearance. Georgia-Pacific's four trademarks—Nos. 2,710,741; 1,778,352; 1,806,076; and 1,979,345—all involve slight variations of the Quilted Diamond Design. *See supra* p. 3.

If the essential feature of the trademarks, the Quilted Diamond Design, is also the "central advance" claimed in any of the utility patents, then Georgia-Pacific has the "heavy burden" to establish nonfunctionality. In determining the "central advance" of a utility patent, the Court will examine the patent claims, and because Georgia-Pacific asserts that any reference to the Quilted Diamond Design in its utility patents is "merely incidental," the Court will also examine the preferred embodiment and summary of the invention.

As an initial matter, the Court discards Georgia-Pacific's claim that the utility patents at issue in this case involve the manufacturing methods or techniques used to create the Quilted Diamond Design, and not the Quilted Diamond Design itself. A claim involving tangible items, such as a product or device, is different from a claim relating to a process, which is comprised of a series of steps. *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002). Even analyzing in a light favorable to Georgia-Pacific, the patent claims refer to a tangible product, namely bath tissue with certain designs, not a step-by-step approach to creating that product. For example, the '057, '156, '639, '776, and '830 Patents only disclose the structural attributes of the "sheet of tissue" and "diamond shaped cells."

The five utility patents all include variations of the same general theme: a Quilted Diamond

esign with different patterns inside the diamond cells.[4]  Further, all of the utility patents contain

figures that match exactly the four designs for which Georgia-Pacific also has trademarks.  *See supra*

p. 3.  For example, the '830 Patent discloses a "sheet of tissue" with a "nonwoven fibrous web" that

exhibits "puffiness and bulk."  U.S. Patent No. 5,573,830 col. 13 l. 14, col. 14 l. 13.  The '776 Patent

is comprised of "diamond shaped cells" and discloses a "sheet of tissue exhibiting puffiness and

bulk" that also minimizes "nesting."[5]  U.S. Patent No. 5,620,776 col.11 ll. 58-59; col. 12 l. 61; col.

14, l. 15.  Further, the '057 Patent claims a "lattice pattern" that is "filled with a signature

debossment" and reduces "nesting."  U.S. Patent No. 5,436,057 col. 9 ll. 11-15; col. 9 ll. 28-31.  The

'639 Patent also discloses that embossing a lattice design and the signature boss at different heights

can achieve utilitarian benefits.  U.S. Patent No. 5,597,639 col. 12 l. 61; col. 13 l. 61; col. 16 ll. 33-

48.  All five utility patents disclose a diamond lattice design filled with signature bosses.  As

contained in the claims, the structural benefits from this design are the "central advance" of the

utility patents.

Georgia-Pacific has asserted that the Quilted Diamond Design is merely incidental, so the

Court will "look beyond" just the patent claims to the specifications.  *See TrafFix*, 532 U.S. at 34;

*see, e.g., Specialized Seating*, 472 F. Supp. 2d at 1012;  *Franek*, 2009 WL 674269, at *14.  First, the

abstracts of the '639 and '156 Patents, for example, state that "[t]he perceived *softness of embossed*

*tissue can be increased greatly while avoiding nesting* when a particular pattern is embossed into

---

[4] A general description of each utility patent, as shown in the Figures of each patent, is as follows: the '639, '057, and '156 Patents are a diamond design with a floral pattern in alternating diamonds; the '830 and '776 Patents are a diamond design with a floral and heart pattern.

[5] "Nesting occurs when embossed elements on a roll align such that they rest upon each other."  (R. 135, Georgia-Pacific's Memorandum in Opposition to Kimberly-Clark's Mot. for Summary Judgment Based on Functionality 18 n.9.)

the tissue." (emphasis added). Similarly, the abstract of Patent '776 described the patent as "[a]n embossed tissue having *improved bulk and puffiness* while being non-nesting by having a lattice pattern and at least two signature bosses." (emphasis added). The '057 Patent includes yet another similar description: "[t]his invention relates to the discovery that the perceived softness of embossed tissue can be increased greatly while avoiding prior art nesting problems *if a particular pattern is embossed into the tissue*." (emphasis added). These abstracts uniformly refer to the Quilted Diamond Design's utilitarian benefits of softness, bulk, and non-nesting.

The Background and Summary of the Invention sections of the utility patents is also instructive. The '057 Patent explains that the perceived softness of the embossed tissue can be increased if a certain pattern is embossed onto the tissue, and this result is achieved through a "sheet of tissue" that has a "lattice pattern." Likewise, the '639 and '830 Patents explain that the "lattice structure" and two signature patterns ("bosses") achieve the desirable features of higher bulk, superior roll compression, and reduced ridging.[6]

Moreover, the preferred embodiments of the utility patents undermine Georgia-Pacific's argument that the Quilted Diamond Design is merely incidental. In order to achieve the perception of increased softness, the preferred embodiment of the '057 Patent is the lattice pattern of diamond cells are filled with "signature debossments," such as a tulip pattern. U.S. Patent No. 5,436,057 col. 4 ll. 46-52. Similarly, for the '639 Patent, a "most preferred embodiment" is "diamond shaped cells" that comprise a lattice, and the cells are filled with a "signature boss." U.S. Patent No. 5,597,639 col. 5 l. 62; col. 6 ll. 56-57. Further, the '156 Patent also described a preferred embodiment as a diamond lattice pattern filled with a signature boss. U.S. Patent No. 5,847,156 col. 5 ll. 61-67.

---

[6] Ridging refers to the evenness of the tissue roll when it is rolled up.

Georgia-Pacific claims that the Quilted Diamond Design is included in the patent specifications and figures only as an "example" of a design that achieves the functional benefits from the manufacturing process. This characterization is incorrect. First, as discussed above, the utility patents at issue here do not describe a series of steps to be followed to achieve the desired benefits – the language of the patents refers only a tangible product, namely the bath tissue with certain designs. Second, the figures are not merely exemplary because the text of the specifications and claims consistently refers to a "lattice pattern" comprised of "diamond cells." For example, the preferred embodiment of the '830 Patent is a "lattice pattern" that is filled with hearts and flowers. U.S. Patent No. 5,573,830 col. 4 ll. 32-35. Similarly, the claims for the '057 Patent specifically note the "lattice structure" and "diamond shaped cells." U.S. Patent No. 5,436,057 col. 9 l.12; col. 10 ll.27-28. No mention is made in the claims about a non-lattice configuration that is able to achieve the desired utilitarian benefits. The clear language of the utility patents rebuts Georgia-Pacific's contention that the designs featured in the figures are only exemplary.

Georgia-Pacific argues that the existence of design patents precludes a finding of functionality. *See* 35 U.S.C. § 171 (design patents are given for "ornamental" designs). As the design patent application states, however, "[b]oth a design and utility patent may be obtained on an article if invention resides both in its ornamental appearance and its utility." (Ralls Dec., Ex. 21.) The functionality of the Quilted Diamond Design remains undisturbed by the design patents because of the utilitarian benefits that are clearly disclosed in the utility patents.

Accordingly, the "central advance" claimed by the utility patents is that embossing a quilt-like diamond lattice filled with signature designs such as hearts or tulips improves softness and reduces nesting and ridging. The utility patents unambiguously include the diamond lattice pattern.

Likewise, the "essential feature" claimed by the overlapping trademarks is the Quilted Diamond Design, which is comprised of a diamond lattice filled with signature designs. The claims, abstracts, summary, and preferred embodiment of the five utility patents show that the utility patents disclose the Quilted Diamond Design. As a result, under the *TrafFix* formulation, Kimberly-Clark has established "strong evidence" of functionality and Georgia-Pacific has failed to sufficiently show that the Quilted Diamond Design is incidental.

## II.    Advertising

The degree to which Georgia Pacific emphasized the utilitarian benefits of the Quilted Diamond Design in its advertising provides additional support for finding that the Quilted Diamond Design is functional. In fact, although by itself advertising will not support a finding of functionality, it is one consideration that factors into the analysis. *See, e.g., Specialized Seating*, 472 F. Supp. 2d at 1104. Georgia Pacific's advertisements included the following claims: (1) the packaging of the Quilted Northern bath tissue stated "Quilted to absorb" and "Quilted to create thousands of places for moisture to go"; (2) "Our two softest layers of premium tissue are gently quilted together to give you and your family exceptional softness and comfort"; and (3) "Quilted Northern Ultra with a unique new quilted design for more quilting and comfort than ever before." (Pl. 56.1 Resp. ¶ 72.)

Georgia Pacific asserts that these phrases are not indicative of the functional nature of the Quilted Diamond Design because they are advertising puffery, and therefore not factual statements about the quality of the product. A plain reading of the advertisements, however, suggests otherwise. The claims made in the advertisements refer to specific attributes of the product, and are not merely vague overstatements. The language of the advertisements links the quilted feature to numerous

18

utilitarian benefits, such as softness, comfort, and absorption. Because the "quilted" feature was a significant "selling point" in the advertisements, the advertisements further affirm that the Quilted Diamond Design is functional. *See, e.g., Franek*, 2009 WL 674269, at *15.

## III.    Difficulty in Creating Alternative Designs for Item's Purpose

The existence of alternative designs that are able to achieve the same result as the Quilted Diamond Design are also relevant to the functionality analysis. There was uncertainty after *TrafFix* about whether the alternative designs factor was still relevant to the functionality analysis. The *TrafFix* Court indicated that if the party asserting the functionality defense can meet the traditional definition of functionality – a feature is essential to the use or purpose of the product or when it affects the cost or quality of the product – the Court need not analyze if there is a "competitive necessity" for the product feature. *TrafFix*, 532 U.S. at 33. This raised the question of whether any analysis of alternative designs is necessary. A reasonable approach has emerged, and the proper role of the alternative designs analysis is as follows:

> Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the available of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002).

Georgia-Pacific asserts that tissue embossed with a variety of designs, such as octagons and hexagons, can possess the same utilitarian benefits as the Quilted Diamond Design. According to Georgia-Pacific, these alternative designs, which can be either embossed tissue without a diamond

lattice or unembossed tissue (no designs), are just as soft, or even softer, than the Quilted Diamond Design. In contrast, Kimberly-Clark claims that although the lattice design can be comprised of different shapes, all that it must show is that the Quilted Diamond Design is "one of a few superior designs." *See In re Bose Corp.*, 772 F.2d 886, 872 (Fed. Cir. 1985); *Eco Mfg.*, 357 F.3d at 654. Further, Kimberly-Clark argues that since Georgia-Pacific described the lattice design at issue as the preferred embodiment of its patents, this is evidence that it is one of the superior designs.

As stated above, under the traditional formulation, a design is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982)). If it is established that a design is functional, the fact that numerous alternative designs are available does not, by itself, render the design nonfunctional. *See Specialized Seating*, 2010 WL 3155922, at *3 (holding a folding chair was functional even though the Seventh Circuit did "not doubt that there are many other available functional designs"). The Court, however, can look to the existence of alternative designs as an overall part of its analysis.

Here, Georgia-Pacific attempts to undermine Kimberly-Clark's argument that the Quilted Diamond Design has many utilitarian benefits by arguing that a seemingly endless list of alternatives could achieve the same positive benefits. For example, the specifications of the '639 and '830 Patents indicate that the designs within the lattice diamond design (signature bosses) "may be made up of any emboss design and are often a design which is related by consumer perception to the particular manufacturer of the tissue." U.S. Patent No. 5,597,639 col. 1 ll. 55-58; U.S. Patent No. 5,573,830 col. 4 ll. 9-13. Based on this, Georgia-Pacific claims that the utility patents encompass the manufacturing process, and therefore the same utilitarian benefits can be achieved regardless of

the exact pattern within the diamond lattices.

The possibility that other alternative designs could achieve the same benefits is overcome by the language in the utility patents indicating that the Quilted Diamond Design is the preferred embodiment. Functionality exists where the design at issue is "one of a few superior designs" for its purpose and it improves the quality of the product; the design need not be the "best design." *Specialized Seating*, 472 F. Supp. 2d at 1013; *Franek*, 2009 WL 674269, at *16. For example, the preferred embodiment in the '057, '156, and '830 Patents is the diamond lattice pattern. Similarly, the design gives an appearance of softness because of the contrasted height difference between the stitches on the sides of the diamond lattice and the signature bosses inside the diamond cells. The Quilted Diamond Design, and its structural features, make the product more useful. Each of the five relevant utility patents disclose the diamond lattice structure, and this is evidence that Georgia-Pacific believed that the diamond lattice was superior to other formations in creating a perception of softness. No other formation, such as circles or hexagons, would be as effective at creating a quilt-like appearance, which conveys softness and comfort. Further, even if there are multiple designs, the relevant inquiry centers around whether the design serves a functional purpose. *See Specialized Seating*, 2010 WL 3155922, at *4 (chair was functional even though there are hundreds of alternative designs because each alternative design was a "novel or distinctive selection of attributes" that make the chair better). A design that serves a functional purpose does not become nonfunctional solely because of the possibility of numerous alternative designs.

## IV.    Design's Effect on Cost or Quality

To be functional, the Quilted Diamond Design must have an effect on the cost or quality of the product. *TrafFix*, 532 U.S. at 24. Kimberly-Clark's Motion for Summary Judgment only asserts

that the Quilted Diamond Design has a positive effect on the quality of bath tissue, not that it decreases the cost of bath tissue. As such, the Court will consider only whether the Quilted Diamond Design increases the quality of bath tissue.

Kimberly-Clark argues that the utility patent claims and specifications explicitly note that the Quilted Diamond Design improves softness and comfort, increases bulk, enhances roll structure, and prevents nesting and ridging. Kimberly-Clark emphasizes Georgia-Pacific's advertising efforts touting these utilitarian benefits as further support that these benefits exist. Georgia-Pacific, however, presents expert testimony from Joseph Miller and Frank Murray that the benefits Kimberly-Clark mentions are not a result of the particular pattern but rather the technique used to emboss bath tissue. Similarly, Georgia-Pacific's experts assert that embossing is not required to produce soft bath tissue.

Miller testified that the surface area of the Quilted Diamond Design contributes to increased absorbency, but the same benefit can be achieved from many design patterns. Miller also explained that even though the unique quilt-like appearance creates the perception that the bath tissue is "softer," many different design patterns can achieve a similar degree of softness. According to Murray, there is unembossed bath tissue on the market that offers a similar level of softness, comfort, bulk, and absorbency. He emphasized that Charmin, the market leader in bath tissue sales, either has unembossed bath tissue or embossed tissue with designs entirely different from the Quilted Diamond Design.

Regardless of the availability of other comparable products, the expert testimony does not create a disputed issue of material fact as to the utilitarian benefits of the Quilted Diamond Design. In other words, the possibility that other designs could achieve the same benefits does not place in

dispute the utilitarian benefits of the Quilted Diamond Design. The utility patents, which involve the tangible product of bath tissue, elucidate that the different heights of the stitches on the diamond lattice and signature embosses within the diamond cells, as well as the quilt-like appearance of the diamond lattice, increases softness, comfort, and bulk. Further, this lattice pattern, when placed on the bath tissue roll in a certain way, reduces nesting and ridging. As noted above, the patent claim and specifications consistently refer to the utilitarian benefits of the Quilted Diamond Design. In fact, the abstracts of the '057, '830, '639, '776, and '156 Patents all specifically mention utilitarian benefits created by embossed tissue with a lattice pattern and signature bosses. It is therefore undisputed that the Quilted Diamond Design improves the quality of the product.

## V.     Georgia-Pacific's Motion to Exclude Kimberly-Clark from Presenting Evidence on the Reasons for Choosing the Scott ® Extra Soft Design and Alternatives Considered

Georgia-Pacific moves for the Court to prevent Kimberly-Clark from offering certain evidence that Kimberly-Clark allegedly failed to produce in discovery. During the time that the parties were briefing this Motion for Summary Judgment, Georgia-Pacific became aware that Kimberly-Clark had recently launched another product featuring a diamond-shaped lattice pattern, Scott® Extra Soft Design. The Court allowed supplemental discovery on the issue of the functionality of this new product, and referred the discovery to Magistrate Judge Keys.

Georgia-Pacific claims that the one Rule 30(b)(6) witness that Kimberly-Clark designated, Heather Sorebo, provided deficient and incomplete information on the functionality of the Scott® Extra Soft Design product. After Sorebo's deposition, Judge Keys granted Georgia-Pacific's Motion to Compel the deposition of Kathryn Sirovatka, a product developer for the Scott® Extra Soft team. (R. 177.) After Sirovatka's deposition, Judge Keys declared that all discovery matters "pursuant to the scope of the referral are resolved." (R. 188.)

23

As an initial matter, neither party directly contests Magistrate Judge Keys's decision to close limited discovery, but his determination that the purpose of limited discovery had been fulfilled is relevant. Typical nondispositive discovery orders fall under Rule 72(a), and therefore the Magistrate Judge's decision is overturned only if it is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see, e.g., Nance v. City of Elgin*, 06 C 6608, 2010 WL 2757164, at *1 (N.D. Ill. July 12, 2010) (Manning, J.). Georgia-Pacific and Kimberly-Clark offer different views on the thoroughness of discovery obtained from the two depositions. Based on the information before the Court, however, Magistrate Judge Keys's determination that the aims of limited discovery were achieved is not clear error.

Specifically, Georgia-Pacific asserts that Kimberly-Clark has failed to produce the appropriate Rule 30(b)(6) witnesses, and accordingly, Kimberly-Clark should not be able to offer evidence regarding the functionality of the Scott ® Extra Soft Design. Rule 30 (b)(6) provides, in part:

> [A] party may name as the deponent a public or private corporation...and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf...The person designated must testify about information known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6). The designated Rule 30(b)(6) witness need not be the "most knowledgeable witness," but rather be competent to testify about information "known or reasonably available to the corporation." *See, e.g., Centagon, Inc. v. Bd. of Dirs. of 1212 Lake Shore Dr. Condo. Ass'n*, 00 C 1110, 2002 WL 356483, at *7 (N.D. Ill. Mar. 5, 2002) (Holderman, C.J.). The rule of reason applies to deciding if the selected Rule 30(b)(6) witness is capable of testifying about the relevant issues. *See, e.g., Costa v. County of Burlington*, 254 F.R.D. 187, 190 (D. N.J. 2008) ("Simply because

defendant's witness could not answer every question posed to him does not equate to the fact that defendant did not satisfy its obligations to prepare its 30(b)(6) witness.").

Here, although Georgia-Pacific claims that Sorebo and Sirovatka's deposition testimony contained topics where their knowledge was incomplete, on the aggregate, Kimberly-Clark satisfied the Rule 30(b)(6) requirement. Sorebo is the Manager of Kimberly-Clark's Value Bath and Towels Research and Engineering Development, and was the manager of the Scott ® Extra Soft team. In general, her testimony touched on the process for selecting the Scott ® Extra Soft design and the functional benefits that the team considered. One of the reasons why Georgia-Pacific considers Sorebo's testimony to be unsatisfactory is that she could not pinpoint the reasons why certain designs made it into the initial pool of five designs that the team considered. This weakness in her testimony does not overshadow the detail she provided about the functionality of the designs, the team's process for testing the five designs under consideration, and why the team eventually selected the Scott ® Extra Soft design.

Similarly, Judge Keys acknowledged that despite the fact that Sorebo was "very knowledgeable," he would grant Georgia-Pacific's Motion to Compel the deposition of Sirovatka. (R.177.) Georgia-Pacific asserts that because Sirovatka had minimal knowledge about the design patterns considered by the Scott® Extra Soft design team, she fell short of the Rule 30(b)(6) requirement. At a status hearing following this deposition, Judge Keys stated that Georgia-Pacific had requested deposing Sirovatka, and determining that limited discovery had sufficiently occurred, referred the case back to the District Court. (R.188.) In sum, the deposition of Sorebo was extensive and she would be the witness with extensive knowledge about the selection of the Scott ® Extra Soft design. Her incomplete testimony in some areas does not overshadow the overall thoroughness and

relevance of her testimony. Accordingly, Georgia-Pacific's motion in limine to prevent Kimberly-Clark from offering evidence about the selection and availability of alternatives for the Scott ® Extra Soft design is denied. The Court also denies Georgia-Pacific's request for the Court to draw negative inferences from Kimberly-Clark's failure to present the proper Rule 30(b)(6) witnesses.

## VI. Georgia-Pacific's Asserted Defenses

Georgia-Pacific claims that under the doctrines of equitable estoppel and laches Kimberly-Clark is barred from asserting the functionality defense. First, Georgia-Pacific argues that equitable estoppel applies here because Kimberly-Clark allegedly misled Georgia-Pacific that it would not assert the functionality defense and Georgia-Pacific relied on this conduct to its detriment. Second, Georgia-Pacific asserts that the equitable doctrine of laches applies, because Kimberly-Clark delayed asserting the functionality defense and this delay caused prejudice to Georgia-Pacific.

### A. Equitable Estoppel

In 1998, Kimberly-Clark asserted the functionality defense against Georgia-Pacific. Georgia-Pacific argues that because the 1998 action involved the same Quilted Diamond Design and Kimberly-Clark has not asserted the functionality defense until now, it should be barred from doing so. A party must satisfy three elements for equitable estoppel: a misrepresentation by the opposing party, reasonable reliance on that misrepresentation, and detriment. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002); *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000). Georgia-Pacific cannot prevail under equitable estoppel because the contract governing the 1998 action preserved for Kimberly-Clark the chance to assert a functionality defense in the future. Specifically, when the parties dismissed the 1998 action, one of the contract clauses stated that the dismissal "shall not limit" Kimberly-Clark's ability to "challenge the validity" of the Quilted Diamond Design

or to "defend itself" in any future action brought by Georgia-Pacific. Given this provision, Georgia-Pacific was reasonably on notice that Kimberly-Clark could assert a functionality defense in the future. Likewise, Georgia-Pacific has not presented the Court with enough facts to conclude that Kimberly-Clark has deliberately engaged in inappropriate or misleading conduct. As such, Georgia-Pacific cannot sustain a claim of equitable estoppel.

### B.     Laches

Similarly, Georgia-Pacific claims that laches precludes Kimberly-Clark from asserting the functionality defense. Georgia-Pacific argues that Kimberly-Clark had a chance to challenge Georgia-Pacific's rights in the Quilted Diamond Design but "sat idly by" until this lawsuit. Laches is based on the concept that "those who sleep on their rights, lose them." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002). Specifically, laches applies in a trademark case where the defendant can show "that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, that the plaintiff inexcusably delayed in taking action with respect to the defendant's use, and that defendant would be prejudiced by allowing the plaintiff to assert its rights at this time." *Id.*

Georgia-Pacific's claim of laches is also unavailing. Kimberly-Clark claims that it only recently became aware that Georgia-Pacific had utility patents that could overlap with the trademarks at issue. Kimberly-Clark asserted the functionality defense reasonably soon after becoming aware that Georgia-Pacific had utility patents for the Quilted Diamond Design. As such, there was no "inexcusable delay" or prejudice and therefore laches does not apply.

### CONCLUSION AND ORDER

For the reasons stated above, the Court grants Kimberly-Clark's motion for summary

judgment. Therefore, the Court grants Kimberly-Clark's Counterclaims I-IV, which requests cancellation of Georgia-Pacific's U.S. Trademark Registration Nos. 2,710,741; 1,806,076; 1,778,352; and 1,979,345. Further, Counts I-VI of Georgia-Pacific's Amended Complaint are dismissed.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 30, 2010